```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
 2                     FORT SMITH DIVISION

 3   MARK I. ADAMS and KATHERINE S. ADAMS,  )
     individually and on behalf of          )
 4   all others similarly situated,         )
                                            )
 5                       Plaintiffs,        )
                                            )
 6        vs.                               ) Case No. 2:14-CV-02013
                                            )
 7   UNITED SERVICES AUTOMOBILE ASSOCIATION;) @ Fort Smith, Arkansas
     USAA CASUALTY INSURANCE COMPANY; and   )
 8   USAA GENERAL INDEMNITY COMPANY,        )
                                            )
 9                       Defendants.        )

10            TRANSCRIPT OF SHOW CAUSE PROCEEDINGS
              BEFORE THE HONORABLE P. K. HOLMES, III
11             UNITED STATES DISTRICT COURT JUDGE
                       FEBRUARY 18, 2014

12

13            A P P E A R A N C E S

14   For the Respondents,          MR. JOHN R. ELROD
     Plaintiffs' Attorneys:        Conner & Winters, LLP
15                                 4375 N. Vantage Drive, Ste 405
                                   Fayetteville, Arkansas  72703
16
     For the Respondent,           MR. JAMES M. MOODY
17   Stephen C. Engstrom:          Wright, Lindsey & Jennings, LLP
                                   200 W. Capitol Ave, Ste 2300
18                                 Little Rock, Arkansas  72201

19   For the Respondents,          MR. DAVID R. MATTHEWS
     Defendants' Attorneys:        Matthews, Campbell, Rhoads,
20                                 McClure, Thompson & Fryauf, PA
                                   119 South Second Street
21                                 Rogers, Arkansas  72756

22   REPORTED BY:

23   RICK L. CONGDON, RMR, FCRR
     Federal Official Court Reporter
24   P. O. Box 8493
     Fort Smith, Arkansas  72902

25

      PROCEEDINGS RECORDED STENOGRAPHICALLY; PRODUCED VIA C.A.T.
```

---o0o---

SHOW CAUSE PROCEEDINGS OF FEBRUARY 18, 2016

---o0o---

1    

2    

3    

4    THE COURT:  Morning.

5    MR. MATTHEWS:  Good morning, Your Honor.

6    THE COURT:  We are here this morning for a hearing in

7    Case No. 2:14CV2013.  The case is styled Mark and Katherine

8    Adams versus United Services Automobile Association, also

9    referred to as USAA.

10    The Court issued an Order on December 21, 2015, for

11    all counsel of record to show cause why sanctions should not be

12    imposed pursuant to rule, Federal Rule of Civil Procedure

13    11(b)(1).  In particular, I did ask counsel to show how their

14    actions in making filings in this Court were not made for an

15    improper purpose.  The hearing was scheduled to give, again,

16    counsel an opportunity to come forward and to be heard and also

17    to give the Court the opportunity to ask some questions of

18    counsel regarding the actions that were taken in this case.

19    Now, also at issue is an additional notice on February

20    11, 2016, to advise counsel that the Court is also considering

21    imposition of sanctions pursuant to its inherent disciplinary

22    authority and also to advise the parties that there would be,

23    if the Court decides the threshold issue, to impose sanctions,

24    that the Court would conduct another hearing, a second hearing

25    because Eighth Circuit precedent clearly provides that before

3

```
 1    any court can impose sanctions against any attorney, there must

 2    be notice of the nature and the type of sanction the Court

 3    intends to impose.  So that is the reason that the Court

 4    entered that Order, again, to make it clear to all of the

 5    parties about how the Court will proceed in this matter.

 6          Now, the attorneys of record in this case are again

 7    represented by counsel, and what I'm going to do is identify

 8    those counsel at this time, and then if they can just advise me

 9    which of their clients are here today.  Again, the Show Cause

10    Order I entered stated that the counsel were not required to be

11    here but could be here.  I anticipate most of them are.  But,

12    anyway, the record does need to show whether or not those

13    counsel are present.

14          So David Matthews represents the USAA counsel, so,

15    Mr. Matthews, if you will let me know who's present here.

16          MR. MATTHEWS:  Do you want me to do that from here,

17    Your Honor?

18          THE COURT:  You can do that from your table.

19          MR. MATTHEWS:  Certainly.  Lyn Pruitt, Steve Goldman,

20    Wystan Ackerman, Steve Clancy, and about half of the Mitchell-

21    Williams law firm.

22          THE COURT:  Okay.  And John Elrod and Vicki Bronson

23    represent the Plaintiffs', some of the Plaintiffs' counsel, not

24    all of the Plaintiffs' counsel, and then Mr. Elrod, if you

25    could identify which of your --
```

```
1              MR. ELROD:  Your Honor, all twelve of our clients are
2      with us here today, Mr. W. H. Taylor, Mr. Tim Myers, Mr. Bill
3      Putman, Mr. Steve Vowell, Mr. Richard Norman, Mr. Marty Weber,
4      Mr. Matt Mustokoff, Mr. Casey Castleberry, Mr. Tom Thompson,
5      Mr. Matt Keil, Mr. John Goodson, Mr. Jason Roselius.
6              THE COURT:  Okay.  Good.  Thank you, Mr. Elrod.  Then
7      we have Judge Jim Moody representing his client, Mr. Engstrom.
8              MR. MOODY:  Yes, Your Honor.  Mr. Steve Engstrom is
9      here.
10             THE COURT:  Okay.  Good.  Thank you, Judge Moody.
11             Now, let me, before we proceed further, let me also
12     note that Mr. Matthews also entered an appearance on behalf of
13     the Defendant USAA and then filed a Response to the Show Cause
14     on behalf of USAA.  The Show Cause Order notice was not
15     directed to the parties and it was limited to counsel of
16     record, so the Court is not considering imposing any sanctions
17     against the USAA as a party.
18             MR. MATTHEWS:  Thank you for that clarification, Your
19     Honor.  That's what I thought, but a belt and suspenders
20     sometimes don't hurt.
21             THE COURT:  Okay.  You're well known for that,
22     Mr. Matthews.  Let me just state here, and what I want to go
23     through is the procedural posture of this matter and how it got
24     here today, but let me just first note that the Show Cause
25     Order are legal issues for the Court to resolve, and the Court
```

1    has a fairly complete record of the facts and circumstances to

2    decide these legal issues.  And, in fact, looking at the

3    record, it's over a thousand pages already.  I didn't envision

4    that we would have such a voluminous record, but, nevertheless,

5    we do.

6         Let me again set out procedurally how the matter

7    arose.  The Adamses filed their original complaint in Circuit

8    Court of Polk County on -- I think on December 5, 2013, which

9    was about two weeks after the Arkansas Supreme Court decided

10   the case of Adams v. Cameron Mutual Insurance Company, which

11   was another case that was pending in this court.  And that was

12   the Supreme Court decision that was, I think, entered in

13   November of 2013 that decided the legal issue of depreciation

14   of labor in actual cash value indemnity insurance policies.

15        Now, it was this Court that certified that question to

16   the Arkansas Supreme Court when -- and I'm going to refer to

17   Adams v. Cameron as Adams I, because the present case are the

18   same Plaintiffs which I call Adams II.  Again, going back to

19   Adams I, the Court did ask the Arkansas Supreme Court to decide

20   that issue.  They did decide that issue and so the Court has a

21   lot of familiarity with the particular legal issue that was

22   raised in Adams I.  Now, of course, exercising a right to

23   federal jurisdiction under the Class Action Fairness Act, USAA

24   removed this case to this Court on January 14, 2014.  And the

25   case was pending on the docket here for 17 months before the

1     dismissal was entered.  And, again, it was filed as a putative

2     class action case.  There was no motion for certification that

3     was ever filed and no class was ever certified in this Court.

4     There were several stays that were entered at the request of

5     the parties so that they could enter into mediation, and the

6     Court typically enters routine text orders staying litigation

7     when the parties ask for it until such time as the Court feels

8     it should no longer be stayed, but there was a motion to

9     further extend the stay on March 16, 2015, which was denied.

10    And at that time the Court entered a scheduling order and

11    directed the parties to respond to a pending motion, a partial

12    judgment on the pleadings, and also the Court set out the

13    deadlines for discovery cutoff, set out a trial date, and also

14    set out the date for motion for certification of class.

15          Looking back over the 12(f) report, it looks like that

16    the Court pretty much adopted the dates for those -- filed

17    those motions which were pretty far out from the date that the

18    Scheduling Order was entered.  Now, what occurred procedurally

19    next, on April 15th, 2015, again, pursuant to the Scheduling

20    Order, the parties filed their Rule 26(f) report, and then on

21    that same day, USAA filed their Motion to Withdraw the Motion

22    for Judgment on the pleadings.  Again, that was a motion that

23    was directed -- it was a partial judgment on the pleadings.  It

24    was directed primarily to the issue of unjust enrichment and

25    fraudulent concealment, which, of course, there was the primary

1    claim of breach of contract.  Now, the next thing that

2    occurred, on June 19, 2015, the parties filed a Stipulation of

3    Dismissal and this case was dismissed by the Clerk's Order on

4    June 22, 2015.

5        Again, as routine in federal courts, when there's a

6    stipulation or Order of Dismissal the Court really does not see

7    that.  It's filed electronically and the clerk, as a routine

8    matter, takes the Stipulation and enters an Order of Dismissal,

9    which it did in this case on June 22, 2015.

10       Apparently, though, before that Stipulation of

11   Dismissal was entered, on June 16, 2015, the parties signed a

12   Proposed Stipulation of Settlement referring to the reviewing

13   court as the Polk County Circuit Court, even though the matter

14   was still pending in this Court.  The case was refiled in Polk

15   County the next day after the dismissal in federal court, which

16   was June 23, 2015, along with a motion to certify the class and

17   approve the settlement that was attached to the Motion to

18   Certify.  The matter was set for a preliminary hearing, and

19   then again a final hearing, and the Polk County Circuit Court

20   approved that settlement in December of 2015.

21       Now, again, let me, before I go into some questions

22   the Court has and, by the way, before the hearing here, I met

23   with counsel for the parties here just to kind of advise them a

24   little bit about the process and the procedure I intend to

25   handle today to hear this, so I think we have an understanding

8

1    about how we are going to proceed.  But, again, let me talk

2    about the standards upon which the Show Cause Order was

3    entered.

4           Rule 11(b) of the Federal Rules of Civil Procedure,

5    which is the applicable rule here, provides that every attorney

6    who presents a pleading, written motion or other paper to the

7    Court, whether by signing, filing, submitting or later

8    advocating, certifies to the best of that person's knowledge,

9    information, and belief formed after a reasonable inquiry under

10   the circumstances that among other things the pleading, written

11   motion or other paper is not being presented for an improper

12   purpose.  Again, that is the inquiry of the Court here.  Where

13   Rule 11(b) has been violated, then, only after notice and

14   opportunity to be heard, the Court may impose a sanction

15   sufficient to deter a repetition of misconduct or other

16   comparable misconduct by others similarly situated.

17          Now, let me again mention, and this is brought up in

18   the parties' brief as well.  Let me mention the standard in

19   review for sanctions in a hearing.  And the Eighth Circuit case

20   law is fairly clear but not completely definitive.  There may

21   be some question whether the standard for Rule 11 sanction

22   determinations initiated by the Court and, by the way, there

23   are several ways sanctions can be initiated.  They can be

24   initiated by a party or they can be initiated sua sponte by the

25   Court, which is what the Court did here.  But what, what Clark

1    v. United Parcel Service says that in determining the sanctions

2    initiated by the Court is more stringent than sanctions

3    determined initially by motion of one of the parties.  So

4    there's probably a higher standard when the sanctions are

5    initiated by the Court as opposed to initiated by the parties.

6    If subjective bad faith -- it says if subjective bad faith is

7    not required, then the Court must only find that counsels'

8    actions, viewed objectively, have manifested either intentional

9    or reckless disregard of the attorneys' duties to the Court.

10   I'm mindful of this particular issue.  In any case, the Court

11   will apply this rule with particular strictness, so I do

12   understand the standard and you've addressed it in your briefs,

13   and to the extent you want to discuss it, you can.

14        Now, the Court, again, also has the inherent authority

15   necessary to exercise its powers, and that includes the

16   inherent power to impose sanctions for abuse of judicial

17   process.  This inherent authority is not mutually exclusive

18   with Rule 11.  In other words, it just presents the Court with

19   additional authority upon which to possibly impose some

20   sanctions and gives the Court the discretion to fashion the

21   appropriate sanction for conduct which abuses the judicial

22   process.  Again, I just only state this, saying this is what

23   the standards are for the Court to follow in making a decision

24   whether or not to impose sanctions.

25        Now, first let me talk a little bit more about really

1    kind of the parameters of this hearing, which I've discussed

2    with counsel already in chambers, but first let me state that,

3    you know, this is actually not a hearing on the merits of the

4    settlement reached by the parties.  The parties have entered

5    into a Settlement Agreement and they have gotten it approved

6    over there in Polk County Circuit Court, and this is a hearing

7    regarding the actions of counsel, not whether or not the merits

8    of the settlement were good, bad or indifferent.  Okay.  The

9    Court is not sitting again to review that class settlement like

10   another court, because some court has already done that.  The

11   terms of the settlement, though, may be relevant to the extent

12   that it indicates that sanctionable conduct did or did not

13   occur before this Court.

14          Secondly, what I'd like to mention and, again, this is

15   argued by the parties somewhat in their brief, the parties have

16   argued that their filing of the Stipulation of Dismissal as

17   well as other filings made in this case were procedurally

18   proper.  Again, I'd like -- the Court has noted and will keep

19   this in mind, that whether something is procedurally allowed is

20   a different inquiry than whether something is proper under Rule

21   11.  While the Stipulation of Dismissal was allowed by Rule 41,

22   the filing of the Stipulation is still subject to the standards

23   of Rule 11, and as I mentioned before, that standard is that it

24   cannot be filed for any improper purpose.

25          Now, counsel have filed extensive briefs in this case.

1    I've read all of these briefs.  They have filed supplemental

2    briefs.  I've read those.  I've read a lot of cases cited in

3    your briefs, and so I pretty well kind of understand what your

4    arguments are, but, again, the purposes -- one of the purposes

5    of this hearing is for you to explain to me in this Show Cause

6    Order why sanctions possibly should not be imposed.

7              Before that, though, I'm going have some questions,

8    and what I told counsel, what I'd like to do is I'm going to

9    first pose some questions, not take testimony but pose

10   questions that can be answered by counsel for USAA or counsel

11   for Plaintiffs, so you can choose amongst them who you want to.

12   Now, trying to think of the easiest way to do this.  My court

13   reporter is real cognizant of making sure he hears what

14   everybody says, so if you'll -- Mr. Matthews, if you want to

15   stay there at your table, you can do that, but just make sure

16   you pull that microphone up and, Mr. Elrod, if you are going to

17   respond to some of these requests, if you'll pull the

18   microphone up, and, Judge Moody, you can likewise as well.

19             One of the things stated in the brief is that the

20   parties have argued that state and federal courts have the same

21   or similar obligation to review class action settlements.  Why

22   did the parties refile their proposed settlement, a settlement

23   they believed was meritorious and worthy of approval for

24   approval in state court?  Mr. Matthews?

25             MR. MATTHEWS:  Your Honor, the refiling in or the

1   settlement in state court was an explicit part of the agreement

2   for the reasons that have been set out, I think, by both

3   parties in the briefs.  Principally it has to do with the

4   appellate review and the possibility for objectors to, in

5   federal court, get a matter prolonged in federal appellate

6   process, whereas in state court the standard for an appeal is

7   different by --

8          THE COURT:  So your argument is that one of the

9   purposes is to evade appellate review?

10         MR. MATTHEWS:  No, sir.  It's not to evade appellate

11  review.  It is --

12         THE COURT:  I understand the difference in federal

13  court and state court regarding appellate review.  I believe in

14  state court, the party has to actually intervene, file a motion

15  to intervene and be allowed to be a party, but in federal

16  court, an objector can take an appeal.

17         MR. MATTHEWS:  That is correct, as I understand the

18  law, Your Honor.

19         THE COURT:  So what that does, that avoids any federal

20  appellate review, by refiling in state court.  Is that the

21  primary reason the Defendants wanted it filed in state court?

22         MR. MATTHEWS:  The Defendants wanted to settle the

23  case, Your Honor, and during the mediation, the terms of the

24  settlement included the settlement being presented in state

25  court.  The Defendants did not have an opportunity to settle on

1    the terms that the Plaintiffs would agree with to present the

2    matter in federal court.

3            THE COURT:  Isn't that true in all settlements?

4    Everybody has -- are you saying that sending the case back to

5    state court was a show stopper in the settlement?

6            MR. MATTHEWS:  Yes, sir.  It was a -- it was a part of

7    the settlement that was negotiated with the assistance of the

8    mediator.

9            THE COURT:  Why, why -- well, why -- you have, you

10   have a provision, I think -- I can't remember what paragraph it

11   is, maybe paragraph -- I don't know.  I've got the Settlement

12   Agreement right here.

13           MR. MATTHEWS:  If you are talking about paragraph

14   44 --

15           THE COURT:  Yeah, you pretty well lock them down --

16           MR. MATTHEWS:  Yes, sir.

17           THE COURT:  -- if you wanted to litigate in federal

18   court, but you didn't care which court reviewed it.

19           MR. MATTHEWS:  We would have been glad to have

20   presented the settlement to Your Honor.  That was not a term

21   that the parties could agree upon.  The Defendants were not

22   afraid then or now of this Court's review of the settlement

23   that was made, but a specific part of the settlement terms was

24   that the case would be presented in state court.

25           THE COURT:  What did USAA get in return for that

1    concession?

2              MR. MATTHEWS:  I beg your pardon?

3              THE COURT:  What did USAA get in return for that

4    concession?  That's a pretty significant concession to, you

5    know, to abrogate federal jurisdiction.

6              MR. MATTHEWS:  Your Honor, what USAA bargained for was

7    a settlement of the class action, a matter that would bring

8    their exposure and cap their exposure and be subject to court

9    review.  We believed then and believe now that the state court

10   was capable of and did provide as thorough a review of the

11   settlement as you would.

12             THE COURT:  I've got a copy of the record and I don't

13   know Judge Ryan.  I'm sure he's a fine man.  I don't know him.

14   In that hearing on that Settlement Agreement, he didn't ask one

15   question about the Settlement Agreement.

16             MR. MATTHEWS:  Your Honor, with respect --

17             THE COURT:  And, again, maybe he's totally familiar

18   with everything, but he didn't ask one question about the

19   Settlement Agreement.

20             MR. MATTHEWS:  Your Honor, I have read the transcript,

21   as I know you would know that I would, and the Settlement

22   Agreement was pretty thoroughly explained by both Mr. Vowell

23   and Mr. Baker.  There were, of course, objectors that were

24   there.

25             THE COURT:  Not, not at the preliminary hearing.

```
 1          MR. MATTHEWS:  Yes.  Well, the attorney was there but

 2     didn't make a presentation.

 3          THE COURT:  He was at the final hearing.  He was not

 4     at the preliminary hearing in August where the Court certified

 5     the class and gave preliminary approval.  That's typically when

 6     a Court reviews a proposed settlement.

 7          MR. MATTHEWS:  Yes, that's correct.

 8          THE COURT:  I get those all the time here.

 9          MR. MATTHEWS:  I certainly don't mean to be

10     argumentative.  I believe Mr. Trammell was in attendance at the

11     preliminary hearing.

12          THE COURT:  In August?

13          MR. MATTHEWS:  Yes, but he did not make an argument.

14          THE COURT:  Okay.  I'm sorry.

15          MR. MATTHEWS:  But his name does appear as having also

16     been in attendance, but certainly he attempted to intervene and

17     file papers to express the interests of his client, and there

18     was a good deal of discussion about that, and Judge Ryan, just

19     as you had indicated you would do in one of your other cases,

20     said despite the notice saying that if you don't file by a

21     certain deadline, if somebody shows up, I'm going to hear them

22     out, and Judge Ryan heard him out and, of course, two days

23     later wrote a pretty comprehensive letter --

24          THE COURT:  Let's get back to again why -- okay.  You

25     are saying that this is a non-negotiable item; the case wasn't
```

1    going to get settled unless it got refiled in state court; that

2    was a show stopper provision of the Settlement Agreement; it

3    wasn't going anywhere?

4            MR. MATTHEWS:  As I understand it, that was --

5            THE COURT:  Why then would they agree to a provision

6    in the Settlement Agreement if it fell through, it would have

7    to be litigated in federal court?

8            MR. MATTHEWS:  Because we would not have settled

9    otherwise.

10           THE COURT:  Yeah.  Okay.

11           MR. MATTHEWS:  USAA brought this case to your court,

12   as it was allowed to do, because of the concurrent jurisdiction

13   because it wished to have its issues litigated according to the

14   federal standard and reviewed on appeal by a federal appellate

15   court.  I think the Court's well aware that it's much more

16   difficult to certify a class in federal court than it is in

17   state court.  And that was -- that was an important and

18   negotiated part of the settlement on behalf of USAA.  But for

19   my lawyer clients, the issue became not did they personally

20   want to try the case, not did they not want their client to

21   settle.  Their client wanted to settle, instructed them to

22   settle, and so the settlement was negotiated.

23           THE COURT:  Yeah.  Okay.  Mr. Elrod?

24           MR. ELROD:  We agree with what Mr. Matthews said, Your

25   Honor, in that the professional objectors issue is very

1    important in the lives of these attorneys.  And they have had

2    to face that many times, and if they can --

3              THE COURT:  What was the prospect of facing it here?

4    This was a -- I've had lots of these class action settlements.

5              MR. ELROD:  Right.

6              THE COURT:  And, you know, professional objectors, I

7    guess, maybe is a particular term, I guess, for someone who

8    does it with some regularity, but, I mean, there's nothing

9    wrong with objectors --

10             MR. ELROD:  There's nothing wrong --

11             THE COURT:   -- appearing and making objections.  I

12   had them here with -- in the PAM Transport case a month ago,

13   had a truck driver that came and showed and wanted to object to

14   the settlement.  I overruled his objections, but --

15             MR. ELROD:  Well, as we all know, in accord with

16   Arkansas case law, state law, one has to move to intervene in

17   order to be an objector, and then one also has to show to the

18   Court, in order to intervene, that other people aren't taking

19   care of the issues, i.e., the Court and the parties.

20             THE COURT:  Okay.

21             MR. ELROD:  And, and, and from the standpoint of

22   getting money that was settled to the class quicker and easier,

23   state court -- the state court procedures -- has nothing to do

24   with Your Honor, has nothing to do with this particular court,

25   the state court procedures are a lot easier to deal with.

1    THE COURT:  Well, one of the provisions you had in the

2    settlement agreement is a quick pay provision.  That means if

3    there are objections or somebody intervenes, that the lawyers

4    get paid.  In fact, I think the Settlement Agreement in this

5    particular case said that the lawyers got paid within 10 days

6    of the settlement regardless of any objections or appeals.

7    Wasn't it, wasn't there a quick pay provision in the Settlement

8    Agreement?

9    MR. ELROD:  Well, there was a provision that they

10   would be paid within 10 days, yes, Your Honor, which I'm told

11   is a standard provision is what I'm told.

12   MR. MATTHEWS:  Your Honor, I'd like to, if I may, also

13   point out, though, that that same provision requires the

14   Plaintiffs' attorneys to pay the fees back if the case is

15   reversed on appeal.

16   THE COURT:  There's all kinds of literature on this,

17   and apparently law professors like to write about this, but

18   they say that's one of the tools of class action lawyers to

19   deal with professional objectors is to have a quick pay

20   provision so that they get paid regardless of what happens.

21   And, sure, there's an obligation to pay it back if it got

22   reversed on appeal, but -- Mr. Elrod, let me ask you one other

23   question regarding, again, I understand you say you wanted to

24   be back in state court, but Mr. Keil filed an affidavit in

25   state court setting out the reasons for filing an action in

1    state court.  He does not mention anything about professional

2    objectors in that affidavit.

3            MR. ELROD:  It's been a couple days since I've read

4    that affidavit.  I assume --

5            THE COURT:  It does not state the basis for wanting to

6    file the action.  It just says that the state courts are better

7    suited to handle issues of state law even though, you know,

8    federal courts in diversity cases hear state law issues all the

9    time.  In fact, in this particular case, the issue of

10   depreciation of actual cash values was an issue that arose in

11   Adams I and the Court is totally familiar with that issue, so I

12   mean to say that this Court is not well versed or suited to

13   understand those issues --

14           MR. ELROD:  I don't believe he said that, Your Honor.

15   I don't believe --

16           THE COURT:  Well, he says in that affidavit state

17   courts are better suited to handle this, this case.

18           MR. ELROD:  He said they are well suited.  I'm not

19   sure -- well --

20           THE COURT:  Okay.

21           MR. ELROD:  I don't have it in front of me, Your

22   Honor.

23           THE COURT:  Okay.

24           MR. MATTHEWS:  Your Honor, if I may, I need to, I need

25   to correct a misstatement that I've made.  You are absolutely

1    right.  I was wrong.  Mr. Trammell was not present at the

2    August -- I read "also present" on that double cover sheet and

3    it was an error.

4              THE COURT:  Mr. Matthews, the record is a thousand

5    pages.  I wouldn't expect you to have total recollection of all

6    the facts of the case.

7              MR. MATTHEWS:  Well, I missed that one, Judge, and I

8    apologize.

9              THE COURT:  That's okay.  I know -- I saw that and I

10   know Mr. Trammell was ever present at the final hearing.  Let

11   me ask this question again.  I'll start with, again, with you,

12   Mr. Matthews.  When was the potential return to Polk County for

13   settlement purposes first brought up or discussed by anyone,

14   when, the timing?

15             MR. MATTHEWS:  I believe, I believe during one of the

16   two mediation sessions.  The parties did not, as I understand

17   it, meet an agreement in principle on that issue until sometime

18   between February 24th and March 31.  There was a substantial

19   debate that went on between the parties, as I understand it,

20   over the whole issue of claims paid versus claims made.  And to

21   the extent that I'm permitted to discuss what goes on in a

22   confidential mediation session, the venue of either of those

23   particular methods of payment was an issue as well.  The

24   parties did not reach agreement in their initial mediation

25   session nor did they in December, although they made progress

1    at both sessions, but in the negotiations between the parties

2    following the mediation session, finally then an agreement in

3    principle was made concerning the settlement that was presented

4    of claims made to be filed in state court.

5         THE COURT:  Okay.  So the discussion of return to Polk

6    County occurred in -- well, the last mediation was on December

7    14, I think, so that discussion occurred as early as December

8    14 about refiling in Polk County?

9         MR. MATTHEWS:  Excuse me, Your Honor.  May I confer?

10        THE COURT:  Sure.

11        MR. MATTHEWS:  Your Honor, I'm advised that the

12   discussion of a claims-made case in state court or a

13   claims-paid case in federal court was the subject of discussion

14   from the first mediation until the final agreement was reached.

15        THE COURT:  Okay.  So it was brought up -- the first

16   mediation, I think, occurred in September, and so refiling it

17   in state court was on the table for discussion as early as

18   September of 2014?

19        MR. MATTHEWS:  Yes, sir.

20        THE COURT:  Okay.  Now, I think I picked this up in

21   the briefs, and I think you just told me, Mr. Matthews, you can

22   correct me if I'm wrong, between the dates of February 21st and

23   what, March 29, that's when the final discussions occurred that

24   culminated in the agreement.

25        MR. MATTHEWS:  The final agreement in principle,

```
1    subject to being properly papered, was made on March 31st.

2    There, there -- that was the end of that day is when the

3    agreement in principle had been reached.

4         THE COURT:  That included an agreement by USAA that

5    the matter be refiled in state court?

6         MR. MATTHEWS:  Yes, sir.

7         THE COURT:  Okay.

8         MR. MATTHEWS:  Of course, subject to the paperwork

9    being prepared and acceptable by both parties, and that took

10   some considerable time.

11        THE COURT:  In other words, until the parties actually

12   signed, executed the agreement, nothing was going to happen?

13        MR. MATTHEWS:  That's correct.

14        THE COURT:  Okay.

15        MR. MATTHEWS:  And then there was, as you've no doubt

16   picked up from the briefs, a corollary issue that came up that

17   caused there to be further delay, and that was the question of

18   whether or not some claims paid by the Garrison Property and

19   Casualty Insurance Company had been included in the

20   calculations that both parties had relied upon during the

21   mediation, and then it was determined that indeed they had, and

22   that's what resulted in the amended affidavit to make clear

23   that in our initial affidavit supporting the removal, that the

24   payments made by Garrison had been included in that -- those

25   figures that were presented to the Court.
```

1    THE COURT:  Okay.  Now, what did USAA get in exchange?

2    That's a pretty valuable concession, being able to litigate and

3    get a case resolved in federal court, and USAA conceded -- what

4    did USAA get in return for that concession?  What was the --

5    MR. MATTHEWS:  What did we get or what did we give?

6    What we got was a provision in the Settlement Agreement that if

7    the settlement fell through for any reason, if Judge Ryan

8    rejected it, if objectors intervened and appealed and the

9    Supreme Court reversed it, and then they chose to attempt to

10   litigate it again, it would be done in federal court.

11   THE COURT:  Okay.  Now, this settlement is a

12   claims-made settlement.

13   MR. MATTHEWS:  Yes, sir.

14   THE COURT:  I mean, it's not a common fund.

15   MR. MATTHEWS:  That's correct.

16   THE COURT:  It's only whoever files claims then, so

17   actually what the -- even though you -- the parties attached a

18   value for whatever purpose, whether that was to determine

19   attorneys' fees or whatever, they said some type of value of

20   three-and-a-half million or whatever this figure was --

21   MR. MATTHEWS:  It was $3,445,000, Your Honor, but,

22   again, that is their party's best efforts at an estimate as to

23   what the maximum recovery might be.

24   THE COURT:  Okay.  But, the extent -- essentially a

25   claims-made provision of the Settlement Agreement is the extent

```
 1    of the -- really all that does is determine the liability of

 2    the Defendant in the case, how much they are going to pay, is

 3    that right?

 4           MR. MATTHEWS:  Well, it essentially establishes a cap,

 5    although, depending upon who files claims and how much those

 6    claims were for, I suppose it, in theory, it could have been

 7    more than $3.445 million.  That's the parties' best estimate

 8    using some, as I understand it, using some science that's been

 9    developed through the years to estimate and calculate to the

10    best of the parties' ability what the exposure is.

11           THE COURT:  Okay.  Now, this Settlement Agreement also

12    had what's called a clear-sailing provision where the

13    attorneys' fees and costs of $1.8 million --

14           MR. MATTHEWS:  Yes, sir.

15           THE COURT:  -- was going to be -- and USAA agreed not

16    to object to --

17           MR. MATTHEWS:  Yes, sir.

18           THE COURT:  -- to fees paid up to that amount of

19    money, is that correct?

20           MR. MATTHEWS:  That's correct.

21           THE COURT:  And that was going to be paid regardless;

22    if the Court approved it, it was going be paid regardless of

23    the number of claims filed.

24           MR. MATTHEWS:  As I understand the law, and as I

25    understand the agreement, Your Honor, USAA agreed that it would
```

1    not object to that figure, nor would it object to the

2    presentation of the materials prepared by the Plaintiffs'

3    counsel to support their claim for that fee.  We did not know

4    whether or not Judge Ryan would approve that fee or subject the

5    fee to the analysis that you had done in the Eastwood case or

6    apply a Lodestar analysis.  That simply was not known.  Our

7    agreement, USAA's agreement was to simply not object.  Had

8    Judge Ryan chose to do so, of course, he could have reduced the

9    fee and that money would have not been paid by USAA.

10              THE COURT:  Well, so USAA actually had no standing at

11   all to object; they just stood silent while the Court

12   determined what the fee was?

13              MR. MATTHEWS:  That is correct.  That was the

14   agreement that was made.

15              THE COURT:  Okay.  Let me --

16              MR. MATTHEWS:  But, Your Honor, if I may, though, I do

17   think it's important, and I know the Court's read this, but at

18   no time was there an agreement that any attorneys' fees or any

19   part of this settlement would not be subject to the full review

20   by Judge Ryan, and I'll represent to the Court --

21              THE COURT:  You know, I -- you know, I understand

22   that, you know, that that agreement is totally laced with

23   provisions that if there is any change, material change,

24   anything by the Court, the parties have the option to walk away

25   from the agreement.  Wouldn't you agree to that?  That's all

```
 1    through the agreement, any material change even in the Court's

 2    Order?

 3              MR. MATTHEWS:  May I confer, Your Honor?

 4              THE COURT:  Yes.

 5              MR. MATTHEWS:  Your Honor, with respect, we think that

 6    it would require a material change in the agreement, and if

 7    that happened, then it was USAA's understanding that if the

 8    parties chose to continue litigation, that it would be in

 9    federal court.  They would have to essentially refile a new

10    lawsuit in federal court.

11              THE COURT:  Okay.  Now, again, on the concession to

12    refile in state court for approval --

13              MR. ELROD:  Your Honor?  Your Honor?

14              THE COURT:  Excuse me.

15              MR. ELROD:  I'm sorry.  We've got --

16              THE COURT:  Go ahead.  You may.

17              MR. ELROD:  I've got some movement --

18              THE COURT:  That's okay.  Yeah.

19              MR. ELROD:  -- and we may want to supplement what's

20    been said.

21              MR. ENGSTROM:  Your -- I thought Richard would say it.

22    Go ahead, Rich.  My understanding, Your Honor -- I'm Steve

23    Engstrom --

24              THE COURT:  Yes, sir.

25              MR. ENGSTROM:  -- and I wasn't involved in the
```

```
 1    negotiation.  I'm co-counsel, but my understanding was that the

 2    Plaintiffs' lawyers were stuck with whatever Judge Ryan chose

 3    to do.  If he chose to go Lodestar or if he chose to go some

 4    very small percentage of whatever it was, that he chose to mark

 5    the attorneys' fees and also what costs were recognized --

 6    there were hundreds of thousands of dollars that were at risk

 7    from the Plaintiffs' side that they had spent so far in the

 8    case -- if he gave us back almost nothing, my understanding was

 9    that was it, that that did not trigger a return to federal

10    court to, to push the case forward, that the Plaintiffs'

11    lawyers were stuck by that.

12            THE COURT:  Okay.  Thank you.

13            MR. MATTHEWS:  I agree with that, Your Honor.  I

14    thought you were talking about material terms of the settlement

15    in terms of the payments --

16            THE COURT:  I just recall reading through the

17    Settlement Agreement.  It's all through there if there are any

18    material changes to the provisions, whether it was the

19    preliminary order or whatever, that the parties have a right to

20    walk away from the agreement.

21            MR. MATTHEWS:  Well, then let me, so the record is

22    clear, say that I agree with what Mr. Engstrom said.  The

23    diminishment of the attorneys' fees was not a clause that could

24    allow them to unravel the settlement.

25            THE COURT:  Okay.
```

1    MR. ELROD:  We agree, Your Honor, we agree with what

2    Mr. Engstrom said, and that is that the fees were fully exposed

3    to Judge Ryan.  He could do what he wanted to do --

4    THE COURT:  Yeah, the agreement does say award of fees

5    up to and sets what that amount is.

6    MR. ELROD:  That's correct, Your Honor.  But subject

7    to Judge Ryan's approval.

8    THE COURT:  Let me, let me, let me ask some

9    questions --

10   MR. ELROD:  Your Honor, before -- could I --

11   THE COURT:  Excuse me.  Go ahead, Mr. Elrod.

12   MR. ELROD:  I'm sorry.

13   THE COURT:  No.  That's okay.

14   MR. ELROD:  Let me just say one other thing, and that

15   is in regard to a previous question that Your Honor answered

16   [sic].  According to the timeline that I have, the agreement,

17   as Mr. Matthews has stated, the agreement in principle was

18   reached on 3/31/15.  My assumption is that from that point

19   forward, they were beginning to address documentation in a

20   serious way.  Then it was on 5/22/15, six weeks later, that the

21   Garrison situation reared its head for the first time, and

22   counsel for the defense approached counsel for my clients to

23   bring in the Garrison issue.  The Garrison data was then

24   exchanged between the parties so that they could make a

25   meaningful decision as to what they wanted to do with Garrison,

1    whether they wanted to give a release to Garrison.  That

2    occurred on June 9, 2015, and it was very shortly thereafter,

3    on the 14th of June, 2015, when inclusion of Garrison, without

4    any further consideration for settlement dollars, was approved

5    by my clients.  I say that, and then it was on 6/16/15 that the

6    final documents were agreed to.  I say all of that to say to

7    Your Honor that but for -- it's clear from the record that but

8    for the sudden previously unknown insertion of the Garrison

9    issue on April 22, that the final settlement documents surely

10   would have been completed shortly after March 31 instead of on

11   6/16.

12         THE COURT:  Okay.  Okay.  Let me ask some questions

13   about a particular case in the -- I want to go to the issue

14   about forum shopping, and that is heavily briefed in your --

15   both, both cases or both briefs by both parties.  And, again,

16   most of the authority that is cited in your briefs relate to

17   forum shopping and the filing of a complaint, whether a court

18   has subject matter jurisdiction, proper venue, whether or not

19   somebody just picked a forum for that particular reason.  This

20   is a situation where a case has been pending for 17 months.

21   And so the question of whether forum shopping is the improper

22   purpose for which this, this particular filing was made, that

23   is the Stipulation of Dismissal.

24         Now, neither one of the parties -- I'm a little bit

25   surprised.  Neither one of the parties cited to the Eighth

1    Circuit case of Thatcher versus Hanover Insurance Company,

2    2011, Eighth Circuit case, an opinion written by Bobby

3    Shepherd, a unanimous opinion.  They held that, and that was

4    the case that I think maybe the lawyers here are familiar with

5    because they were counsel in that case, where the Eighth

6    Circuit held that a named plaintiff was not entitled to

7    voluntarily dismiss a putative class action after removal in

8    order to file a revised complaint in state court that omitted

9    several causes of action in an attempt to reduce the amount in

10   controversy below $5 million, which was the cap of jurisdiction

11   amount.  Now, the Eighth Circuit explained that the plaintiff

12   had set forth no adequate reason why it would benefit the class

13   to abandon these additional claims.  Now, again, this is a case

14   that has not been certified.  The Eighth Circuit also noted

15   that the federal courts have long recognized that, quote, the

16   right to remove an action which falls within the jurisdiction

17   of the federal courts is a substantial right.  The federal

18   courts should be astute not to permit devices to become

19   successful which are used for the very purpose of destroying

20   that right, end quote, and then further says -- the case

21   also -- the opinion also states that a party is not permitted

22   to dismiss merely to escape an adverse decision in order to

23   seek a more favorable forum.  And so it appears the Eighth

24   Circuit recognizes that the Court should be on guard against

25   procedural maneuvers made to the detriment of an absent class

```
 1    even prior to certification, so there in the Hanover case you
 2    had a situation where Judge Hendren dismissed the action
 3    without prejudice so it could be refiled in state court, and an
 4    appeal was taken in the Eighth Circuit that says that he
 5    failed, he failed to take into account whether or not the
 6    Plaintiffs were in an effort forum shopping to get a better
 7    forum in which to litigate those claims.
 8           Now, my question is were any counsel of record
 9    unaware, not know about this Eighth Circuit precedent in
10    Thatcher at the time the stipulation of dismissal was entered?
11    Now, I know some counsel were because they were counsel of
12    record, but I need to -- I think this is an important case
13    because I think this is on point which neither party addressed
14    in their briefs.
15           MR. MATTHEWS:  I need to confer with my lawyer
16    clients, Judge, to see if they knew about the case.  I'm pretty
17    sure I know the answer, but I don't want to speak out of turn.
18           (Off the record briefly.)
19           MR. MATTHEWS:  Your Honor, I'm prepared --
20           THE COURT:  Let's hold up, give them an opportunity to
21    confer just a moment.
22           MR. MATTHEWS:  Sure.
23           (Off the record briefly.)
24           MR. ELROD:  Your Honor, I apologize.  We are trying to
25    prove a negative here.
```

```
 1              THE COURT:  Okay.  Well, have a seat, Mr. Elrod.
 2              MR. ELROD:  But could I respond?
 3              THE COURT:  You can.  Let me go with Mr. Matthews
 4    first.  We kind of got out of order here.  I will come right
 5    back to you.
 6              MR. MATTHEWS:  Your Honor, I'm informed that my
 7    clients Goldman, Ackerman, and Pruitt were aware of the case,
 8    and, indeed, they were involved in the case.  My client,
 9    Mr. Clancy, was not aware of it.  If the Court would permit me,
10    I would explain to you why we did not cite it in our brief.  We
11    did not believe --
12              THE COURT:  I'm going to give you that opportunity in
13    just a moment.  Let me ask Mr. Elrod again, because I do need
14    to know.  I think this is significant.
15              MR. ELROD:  Your Honor, obviously, my clients who are
16    named as having been involved in the case knew about it.  Now,
17    I'm trying to determine who amongst the twelve who were not
18    involved in the case did not know about it.  That's --
19              THE COURT:  Okay.
20              MR. MOODY:  Your Honor, Mr. Engstrom was not involved
21    in the case and was not aware of it.
22              THE COURT:  Doesn't sound like he was involved in the
23    negotiations or in any of it, so that stands to reason.
24              MR. MOODY:  Yes, sir.
25              THE COURT:  Thank you, Judge Moody.
```

```
1            MR. ELROD:  So I'm going to make the representation to
2       the Court.  I'm asking my clients to listen to the
3       representation to make absolutely sure that we're not -- that
4       I'm stating it correctly.  I am told, Your Honor, that only my
5       clients who are listed as having been involved in the case knew
6       about the decision when it was rendered.  That would have been
7       Matt Keil, John Goodson, Jason Roselius, and that's it.  Now,
8       if anybody disagrees with that, please speak up now.
9            THE COURT:  Okay.  That answers -- excuse me.
10           MR. ELROD:  Wait a minute, Judge.  (Pause)  Mr. Weber
11      says, Your Honor, that he read the case at some point after it
12      came out and did not revisit the case until he e-mailed it to
13      me yesterday.
14           THE COURT:  Okay.  Thank you, Mr. Elrod.
15           MR. ELROD:  I'm sorry for the confusion.
16           THE COURT:  That's okay.  Now, Mr. Matthews, was
17      Thatcher ever discussed during negotiations about how it might
18      present a problem?
19           MR. MATTHEWS:  That I don't know.  It was not, Your
20      Honor.
21           THE COURT:  Okay.  Now, Mr. Matthews, let me ask you
22      this question.  How is the ability of counsel of both parties
23      to negotiate the Defendants' forfeiture of its chosen forum of
24      federal court after removal not a device that chips away at the
25      right of removal?
```

1     MR. MATTHEWS:  Well, Your Honor, number one, as the

2 Court knows, the clause -- the Settlement Agreement contained

3 some specific negotiated-for language that would preserve my

4 clients' ability to litigate the matter in federal court in the

5 event the settlement was not approved.  Number two --

6     THE COURT:  So they wanted to litigate in federal

7 court, but they wanted it reviewed in state court?

8     MR. MATTHEWS:  They wanted it settled.  We wanted it

9 litigated in federal court, and we would have been perfectly

10 fine to have presented this settlement to Your Honor, but that

11 was not one of the settlement terms that was available and that

12 was agreed upon, and our clients, my lawyer clients, were

13 instructed by their client that the USAA wanted to effectuate a

14 settlement.  The only settlement that was available to USAA

15 was -- that they were willing to enter into was a claims-made

16 settlement and the only forum that was available to USAA for a

17 claims-made settlement was state court.  I would like to

18 address why we did not -- why our briefs have been silent on

19 the Thatcher case, if you'll give me just a moment.

20     THE COURT:  Go ahead.

21     MR. MATTHEWS:  We did not think it on point with the

22 issues that are raised here because it was in the, in the

23 Thatcher case it was indeed these lawyers who were arguing to

24 the Court that a plaintiff ought not to be able to take a

25 voluntary dismissal after an Answer had been filed.  In that

1    case, you may know, the Answer was filed about 12 minutes

2    before the Motion to Dismiss and wanted the -- wanted -- once a

3    person had been properly removed to federal court, in the

4    absence of an agreement to jointly dismiss the case, that the

5    Plaintiffs should not be able to withdraw their complaint so

6    they could diminish their claim in order to defeat removal.  We

7    did not think that was on point at all with the facts that are

8    before Your Honor today.

9         THE COURT:  Well, what difference does the mechanism

10   make, because the Hamm -- in the case cited in -- Thatcher

11   cites another Eighth Circuit case, Hamm versus Rhone, the Rhone

12   case, which is a 1990 case where there was no Answer filed.  It

13   was just a Motion to Dismiss filed, and in that particular

14   case, which is also a putative class action, again, that was

15   under the old rules of a class action, but it referred to

16   dismissals, but someone in that case attempted to make just an

17   outright dismissal and the Court -- and basically what the

18   Court said, we are going to treat this rule to Dismiss like a

19   Motion for Summary Judgment and we are going to --

20        MR. MATTHEWS:  Well, Your Honor, I think the important

21   distinction is that was under the old rules, and the rules have

22   changed.

23        THE COURT:  That was an old rule regarding whether or

24   not -- of course, the rule was amended that it's subject to

25   23(e).  23(e) is the provision for class action settlements.

```
 1              MR. MATTHEWS:  Yes, sir.

 2              THE COURT:  And then you cannot have a stipulated

 3    dismissal then because that is a class that's obviously been

 4    certified --

 5              MR. MATTHEWS:  Yes, Your Honor.

 6              THE COURT:  -- and that's not the case here.  But this

 7    case has been pending for 17 months.

 8              MR. MATTHEWS:  Yes, sir.

 9              THE COURT:  It's not like a case early on where a lot

10    of dismissals, voluntary dismissals occur early on in the

11    litigation when there's not much going on, but here you had a

12    case that was pending for 17 months.  It had been stayed.  The

13    Court had entered a Protective Order, which the parties used to

14    exchange documents and to discuss settlement --

15              MR. MATTHEWS:  Yes, sir.

16              THE COURT:  -- in this case before it entered its

17    Stipulation of Dismissal, but -- well, let me ask you this

18    question.

19              MR. ELROD:  Are you going to move on, Your Honor?

20              THE COURT:  Yeah.  Excuse me.  Go ahead, Mr. Elrod.

21              MR. ELROD:  I need to respond.  First of all, CAFA

22    permits to be done what was done.

23              THE COURT:  Pardon me?

24              MR. ELROD:  CAFA permits to be done what was done.

25    There was debate back in, I think, 2003 whenever, somewhere in
```

1    that time period about whether or not settlements could return

2    to state courts.  United States Congress considered that and

3    they rejected it.  So CAFA permits to be done what was done.

4    CAFA does.  The second point I would make, Your Honor, is that

5    when both parties agree to move to another concurred

6    jurisdiction, that, by definition, is not forum shopping.

7    Forum shopping is when one party decides where they are going

8    to go, what they are going to do, how they are going to get

9    there.  And the third point --

10           THE COURT:  You didn't -- there is not one case cited

11   in your brief that deals with forum shopping midstream in

12   litigation, not one case.  All -- I mean, you cite, you cite

13   all these cases in your brief, Mr. Elrod, and these briefs had

14   to do with -- in fact, the one case, the McCuin case that you

15   cite out of Texas has to do -- which you rely upon about where

16   parties can do all the forum shopping they want to when they

17   file their complaint.  What happened in that case, it had been

18   pending for two years and the defendant goes out and hires the

19   judge's brother-in-law to get the judge removed from the case

20   and moved to some other venue before some other judge.  They

21   didn't like the jurisdiction they were in.  If you read the

22   footnote in that case, it said, well, the fact that the

23   plaintiff did forum shopping does not help the defendant's

24   position at all in this case because it was done obviously for

25   the purpose of avoiding jurisdiction.  So --

1          MR. ELROD:  Well --

2          THE COURT:  -- I don't see how that helps at all.

3          MR. ELROD:  Let me make one other point, Your Honor,

4     and that is the way Rule 41 works.  Thatcher dealt with --

5     Thatcher was an opposed motion opposed by these gentlemen

6     sitting over here.  That is a motion made under 41(a)(1).

7          THE COURT:  Instead of (a)(2), yeah.

8          MR. ELROD:  Yes, sir.

9          THE COURT:  I understand the difference.

10         MR. ELROD:  And we are operating under (a)(2) where

11    both parties stipulated to a dismissal and that's unfettered.

12         THE COURT:  Okay.  Let me -- that really -- I'm glad

13    you mentioned that because that really goes into my next

14    question because this is what I picked up in your briefs.  And

15    what you, what you argue in those briefs is that counsel has

16    the unfettered, unfettered right to file a Stipulation of

17    Dismissal right under Rule 41(a)(1)(A)(ii), and that your

18    further argument is that where there is a stipulated dismissal,

19    the Court can never, and I mean never, look into the underlying

20    purpose behind the Stipulation of Dismissal.  Is that your

21    argument?

22         MR. ELROD:  That's our argument, Your Honor.

23         THE COURT:  That case that you -- that the Court has

24    no authority to look behind the purpose if it's a stipulated

25    dismissal.

```
 1          MR. ELROD:  That prior to class certification --

 2          THE COURT:  Prior --

 3          MR. ELROD:  Prior to class certification --

 4          THE COURT:  Even though it's a putative class action,

 5   which is what Thatcher was?

 6          MR. ELROD:  That's correct, Your Honor, but that was

 7   an opposed motion.

 8          THE COURT:  Well, what difference procedurally -- if

 9   the procedural mechanism was a stipulation or a motion to the

10   Court --

11          MR. ELROD:  Because both parties agreed in this case

12   to a stipulated dismissal.

13          THE COURT:  So both parties agreed that they didn't

14   want the review of the federal court, so they go back to state

15   court to get a more favorable forum?

16          MR. ELROD:  No, Your Honor.  They went back to state

17   court.  They did not go back to state court to get a more

18   favorable forum.

19          THE COURT:  I tell you, really what -- and you

20   probably, probably -- and I've had this before.  You've read

21   the other cases I had in Eastwood, and your law firm was

22   involved in the PAM Transport case --

23          MR. ELROD:  Yes, Your Honor.

24          THE COURT:  -- and I know you're totally familiar with

25   that as well, but, you know, if you, if you -- and this is the
```

1   problem when the Court sees a settlement that is a claims-made

2   settlement.  It's not a common fund settlement or even one like

3   Eastwood where there was a -- there may have been a common

4   fund, but there was a reversionary fund for claims not made,

5   and then as I stated in Eastwood, I wanted to know what the

6   claims rate was, and that's a question I'm going to have here,

7   too, as well today, what the claims rate was in this case, and

8   then a clear-sailing provision and, you know, if you read, you

9   know, the foremost authority on class actions is Newberg, and

10  as it says, claims-made settlements are disfavored because they

11  tend to promise far more than they deliver.  Okay?  And it

12  further says that, you know, what it -- and, of course, what

13  the -- in fact, exactly like I had in Eastwood, when the

14  lawyers came here in Eastwood and wanted that claims-made

15  settlement, they said we expect a robust claims.  We expect 90

16  percent of these  insureds -- another insurance company.

17  Insurance companies, of course, know who their insureds are.

18  They know what the claim was that was paid.  They have all of

19  that information in their computers.  Okay.  They said we

20  expect a robust claims rate.  And I said, well, I'm not going

21  to determine attorneys' fees until I know what the claims rate

22  was.  The claims rate was  17 percent.  Of course, the

23  attorneys wanted fees that exceeded far what the claims were in

24  this case.  That's what's problematic.  And that's exactly what

25  Newberg says.  You know, it says these claims-made settlements,

1    this troubles courts even more so if the settlement includes a

2    clear-sailing provision of whereby the defendant agrees not to

3    contest counsel's fee request up to a certain level.  The

4    combination makes it appear as if class counsel agree to a low

5    defendant liability in exchange for an easy fee.  And they

6    say -- further, it says that these are even less justifiable

7    when combined with a burdensome claiming process which, you

8    know, we had a claims process here that required the class

9    members to produce -- said -- the word did say "may" in there

10   but produce documents that the insurance company already had.

11   And so that, that is when, when -- that is why courts are

12   required to give close scrutiny to these settlement agreements

13   because that was exactly what occurred here.

14        MR. MATTHEWS:  Excuse me, Your Honor.  May I --

15        MR. ELROD:  May I go first, make a statement?

16        MR. MATTHEWS:  -- make a comment on the claims form?

17        THE COURT:  Sure.

18        MR. MATTHEWS:  There was also a box that said I don't

19   know for every question, and the claimant could -- was free to

20   check I don't know, and their claim would have been paid

21   without regard to whether they had any documentation.

22        THE COURT:  Yeah.  You know, one thing, I looked at

23   that claim form and there's one word that people do understand,

24   and I signed this under the penalty of perjury and I have

25   produced the documents that I have available, and these are

 1    documents you're asking for that the insurance company already

 2    has, but, anyway, we don't need to get off, delve into that,

 3    because I do understand that.  Mr. Elrod, you have cleared up

 4    my -- your position here about -- and that's exactly what I

 5    thought it was, but I now have a full understanding, so

 6    you're --

 7         MR. ELROD:  And I'm --

 8         THE COURT:  So I haven't found any authority for that,

 9    but I do, I do, and I'm going to look, but I understand your

10    position now clearly.

11         MR. ELROD:  And I'm, I'm -- I can either wait until

12    argument or address the other comments Your Honor made right

13    now and what you, what you --

14         THE COURT:  What I'm going to -- I mean, this is

15    when -- to the colloquy where I wanted to, you know, just ask

16    some questions, and, you know, this is a hearing.  Your clients

17    are the ones who are the subject of the sanction.  I want to

18    give you a full opportunity to make every argument you can and

19    want to make.  Okay?

20         MR. ELROD:  Thank you, Judge.

21         THE COURT:  Okay.  Now, again, and I asked that

22    question to Mr. Elrod because I'm wondering how that applies

23    where, you know, where you have a Settlement Agreement that has

24    already been reached and it's binding on the absent class

25    members.  I mean, this Settlement Agreement was reached on June

1    16, 2015, and before, while it was still pending in this Court,

2    and it bound the absent class members.  And to me that's

3    exactly what the Court is concerned, what the Court was

4    concerned about in Thatcher when it said that, you know, what

5    they have done here, what they have done in Thatcher is that

6    they have abrogated and gave away claims of absent class

7    members before the case was even --

8         MR. ELROD:  Well, Your Honor, it didn't, it didn't

9    bind absent class members until the final gavel was pounded.

10        THE COURT:  I know, but the probability of that not

11   happening is pretty remote.  I mean, you know how these class

12   actions work.  You know, you have a class representative and

13   they negotiate it and then go submit it, but the -- of course,

14   what, what that -- what happened to that -- and that's the

15   whole reason, one of the primary reasons for the inquiry is

16   the, you know, the appropriate use of federal jurisdiction and

17   then absent class members.  It's the absent class members that

18   end up paying for a settlement when the claims rates are low.

19   That's exactly what happened in the Eastwood case.

20        MR. ELROD:  But that's -- this was not an Eastwood

21   settlement, Your Honor.

22        THE COURT:  I know it's not.  Yeah.  I'm just -- I'm

23   doing that because that's one experience that the Court had.

24   Let me -- I've got just a couple more questions and then I know

25   that you-all have -- want an opportunity to make some

1    statements as well.  I have this question.  The settlement

2    agreement indicates there are 7,687 potential class members.

3    Mr. Keil's affidavit mentions there were like 14,000 class

4    members, and then Mr. Baker stated at the hearing, I think,

5    there were 15,000 class members.  How many class members were

6    there?

7           MR. MATTHEWS:  There were just under 14,000 notices

8    that were mailed and approximately 14,200, I think, that were

9    successfully delivered.

10          THE COURT:  How many claims were filed?

11          MR. MATTHEWS:  Your Honor, I would respectfully object

12   to that question as being confidential information.

13          THE COURT:  On what basis?

14          MR. MATTHEWS:  Well, first of all, I don't think it's

15   relevant to the inquiry on sanctions, but it involves

16   confidential --

17          THE COURT:  You know, it is relevant to an inquiry as

18   to why the -- you know, the purpose for submitting the matter

19   to state court for review.

20          MR. MATTHEWS:  Excuse me.  We certainly would not have

21   known that at the time that the settlement was entered, but at

22   any rate, Your Honor, in anticipation that you were going to

23   ask that question, as I told you in chambers, I need to make my

24   objection, but we have had the opportunity of our client, USAA,

25   to provide that information to the Court in camera.  It is

1   confidential information.  It's a part of the information that

2   USAA has to retain, and as I've explained to the Court, they

3   have other pending litigation in other jurisdictions that -- on

4   many issues that are similar to this, and so to allow that

5   information to be revealed which is obviously held confidential

6   by the Court's original Order and by the Court's Order that was

7   entered in state court, that would at least potentially be a

8   competitive disadvantage to USAA, so I would respectfully

9   request the opportunity to answer that question in camera.

10          THE COURT:  Okay.  Well, I'll have to figure out the

11  way in which I am going to allow you to do it.  I tell you what

12  I'm going to do for the purposes of the hearing today, I am

13  going to allow you to submit that information in camera.

14  That's not to say that the Court may not make it a part of the

15  record in deciding the case, but what I would like for you to

16  do is make a filing, excuse me, in camera to the Court and I

17  want to know exactly -- I want to know what the claims rate was

18  and I want to know how many claims were filed out of these

19  14,000 class members.  Now, I also want to know what the value

20  of those claims were.

21          MR. MATTHEWS:  Okay.  I can answer the value question

22  quickly by telling you that that won't be determined for

23  several months.

24          THE COURT:  Well, you do have, you do have some, I

25  would think, some general idea about what the value of those

1    claims are.

2         MR. MATTHEWS:  Actually we don't know, Your Honor,

3    because part of the requirement would be for each of these

4    claims to have the claim fully evaluated to know how much they

5    are entitled to.  Some claimant may get five dollars and some

6    claimant may get $5,000, and that's not something that can be

7    done without an independent evaluation of the file.  In fact,

8    that's one of the underlying reasons for the claims-made

9    settlement in the first place.  To do otherwise, would have

10   required --

11        THE COURT:  Well, they know -- I mean, you know what

12   the claim was.  You know what the depreciation was.  And you-

13   all have agreed on what the -- 45 percent on what the

14   depreciation was.

15        MR. MATTHEWS:  We know, we know in general what the

16   maximum amount of depreciation taken over a period of time was.

17   We do not know what the individual claimant's depreciation was.

18   That requires an individualized review of the claim form, and

19   the Court -- the settlement provides that USAA has six months

20   from the date of the closing of the claims to actually

21   calculate and make those distributions.

22        THE COURT:  Okay.  The claims closed what, on February

23   1?

24        MR. MATTHEWS:  Yes, sir, although they are --

25        THE COURT:  So that's been three weeks since --

47

```
1          MR. MATTHEWS:  And there have been some claims that
2     have been filed and accepted late, as I understand it.
3          THE COURT:  Yeah.  Okay.  Do Plaintiffs' counsel know
4     how many claims have been filed?
5          MR. MATTHEWS:  Do Plaintiffs' counsel?
6          THE COURT:  Yeah.
7          MR. MATTHEWS:  I don't know whether they know that or
8     not.  I'm informed they do.
9          THE COURT:  Okay.  Now, as I understand it, the
10    Circuit Court of Polk County, there's nothing left to be done
11    there in regard to that, in regard to either notifying the
12    Court as to what the claims rate was, is that correct?
13         MR. MATTHEWS:  I don't, I don't -- I believe that's
14    correct, although, Your Honor, there is the possibility of an
15    appeal from the state court case.  I think you can take
16    judicial notice of the fact that a Notice of Appeal was filed
17    with the proper appellate court in Arkansas by Mr. Trammell on
18    behalf of his clients.
19         THE COURT:  Okay.  One last question.  This relates to
20    Adams I and Adams II.  In Adams I, counsel for the most part
21    were the same, so not all the Plaintiffs' counsel were involved
22    in Adams I.  Some of them were.  The Mitchell firm represented
23    Adams I up until the end of January 2015.  Of course, Mr. Ney
24    was the partner in the firm handling the Adams v. Cameron
25    matter at the time, and then he left to join another firm and
```

1    then he continued to handle that case, so the Mitchell firm is

2    no longer involved in Adams I after that -- at that particular

3    date.  And, of course, the Court was notified in March, March

4    5th that Adams I had been settled.  Now, Adams I is the

5    identical case to Adams II, just different companies.  Now,

6    Adams I, the Settlement Agreement, of course, was filed of

7    record, and I believe that -- I can't remember the exact dates

8    on it, but the Court was told on March 5 that Adams I had been

9    settled, so obviously the Plaintiffs in that case knew what the

10   terms of the settlement were.  And then -- and when that --

11   when the Court entered that text order to file a motion by

12   March 27 for preliminary approval, of course, it was filed and

13   attached a copy of the Settlement Agreement, so my question

14   relates to Adams I and the terms of that settlement.  Was Adams

15   I, and specifically the settlement or the negotiations involved

16   in that case, were they discussed by any counsel of record

17   during the negotiation of the settlement of Adams II or at any

18   time before the filing of the stipulation of dismissal?

19        MR. MATTHEWS:  It's my understanding that it was not.

20   My clients were not aware of the actual terms of the settlement

21   in Adams I at the time the settlement in principle was reached

22   on March 31st.

23        THE COURT:  Okay.  So you are telling me it was never

24   discussed?

25        MR. MATTHEWS:  Let me double-check, Your Honor.  My

1    lawyers tell me that they were informed that there were

2    negotiations for a settlement in Adams I versus Cameron but

3    they were not aware of the terms.

4            THE COURT:  Okay.

5            MR. ELROD:  Your Honor, if I could, my timeline shows

6    that on 3/31/15, the agreement in principle is reached between

7    these parties.  They were still negotiating the specific terms

8    of the documents, and it was on 5/13/15, six weeks later, that

9    the Cameron fairness hearing occurred which is when Your Honor

10   made -- expressed your opinion about the way Your Honor was

11   going to handle class action settlements.

12           THE COURT:  That all occurred before the stipulation

13   was signed on June 16?

14           MR. ELROD:  Before the stipulation was signed but

15   after the agreement was reached in principle.

16           THE COURT:  Yeah, but as we know, the parties didn't

17   considered it a final agreement until the agreement had been

18   signed, as I understand.  Okay.

19           MR. ELROD:  May we complete the record at some point

20   to make sure that the record shows which of my clients were

21   involved in Adams I and which were not?

22           THE COURT:  Yes.  I do -- you know, I am going to make

23   Adams I a part of the record here, and the docket will show who

24   the attorneys are, so --

25           MR. ELROD:  Very good, Your Honor.

1    THE COURT:  Yeah.  Because obviously all of the

2    counsel in Adams II were not involved in Adams I.

3    MR. MOODY:  Your Honor, for Mr. Engstrom, he was not

4    attorney of record in Adams I or involved in the negotiations.

5    THE COURT:  Okay.  Good.  Thank you, Judge Moody.

6    MR. MATTHEWS:  Your Honor, also, if you do make Adams

7    I a part of the record, would you, by footnote or some other

8    way, point out that my clients Pruitt, Ackerman, and Goldman

9    were removed from as counsel of record --

10   THE COURT:  Yes.

11   MR. MATTHEWS:  -- before the settlement was filed?

12   THE COURT:  Yeah, yeah.  I believe that --

13   MR. MATTHEWS:  These guys are hastening to say they

14   were never in it --

15   THE COURT:  Yeah, they were never involved in it,

16   and --

17   MR. MATTHEWS:  -- Ms. Pruitt was in it --

18   THE COURT:  -- and I'm sure there were other lawyers,

19   I don't know who, I can't remember who they were in the

20   Mitchell firm, but they filed a motion to withdraw as attorney

21   of record, I think, at the end of January when that Order was

22   entered allowing them to withdraw.

23   MR. MATTHEWS:  Yes, sir.

24   THE COURT:  So the only counsel after that date was

25   Mr. Ney of the Friday firm.

```
 1              MR. MATTHEWS:  Correct.

 2              MR. ELROD:  Your Honor, it's the belief of my clients

 3    that Your Honor misspoke in terms of there being no differences

 4    between Adams I and Adams II, and I would ask leave of the

 5    Court for Mr. Weber to be able to address that issue at this

 6    point in time rather than put it off until later.

 7              THE COURT:  That would be fine.

 8              MR. ELROD:  Thank you.

 9              MR. WEBER:  Marty Weber, Your Honor.

10              THE COURT:  Yes, sir.

11              MR. WEBER:  I do want to address quickly the Court's

12    statement that -- and I believe it's the Court's belief that

13    Adams I and the USAA case are identical cases, and we do take

14    issue with that, Your Honor.  From our perspective, they are

15    completely different.  In Adams I, as the Court recognized at

16    the beginning of its statements today, the certified question

17    dealt with ACV policies.  There were two things that were going

18    on in the Cameron case and I wasn't -- in Adams I.  I wasn't

19    involved early on.  I got involved very late in the case about

20    the time that the issue was going up to the Arkansas Supreme

21    Court.  But in that particular case, the certified question

22    dealt with ACV-only policies.  In the USAA litigation, much of

23    the debate between parties focused around the open questions of

24    whether the Arkansas Supreme Court ruling on ACV policies had

25    applicability to RCV policies, and RCV policies were primarily
```

1    at issue in the USAA litigation.  At the time that this

2    settlement was being negotiated, there was a second case that

3    was headed to the Arkansas Supreme Court, the Shelter

4    litigation.

5              THE COURT:  Yeah, I'm familiar with that.

6              MR. WEBER:  That Shelter litigation dealt with the

7    question of RCV policies, was going to answer some open

8    questions there.  So there was much debate amongst our side as

9    to the levels of risk, what would happen at the Arkansas

10   Supreme Court, would it be constrained to an ACV-only

11   applicability on the depreciation of labor, would that opinion

12   carry over and have any applicability to RCV policies?  So from

13   our standpoint as we were addressing the issues of risk, which

14   is what we have to do as Plaintiffs' counsel when we are making

15   determinations of do we push forward in litigation or do we

16   resolve cases, that was a major difference for us between those

17   two types of cases between Adams I and the USAA litigation.

18             THE COURT:  Yeah, I did state that they were

19   identical.  I was aware that they are not identical.  They are

20   fairly identical in regard to the threshold issue, but they

21   involve different insurance policies and different definitions,

22   and so I can definitely see where the legal issues might be

23   different and counsel may have different arguments to make.  I

24   mean, the issue in Adams I was you had an actual cash value

25   policy in which the term "actual cash value" was not defined.

1    And in Adams II you had what's called a replacement cost value.

2    Well, of course, there is a difference between a replacement

3    cost and actual cash value, but actually when you look whether

4    they called it that or whatever they treated it as an actual

5    cash value policy, and I don't recall if it had that definition

6    to it or not, but I do recognize that there are some different

7    legal arguments in regard to Adams I and Adams II.

8            MR. WEBER:  And if I might continue, Your Honor,

9    because as I read this Court's initial Order, that was

10   obviously an issue that the Court had concern that there was

11   one type of settlement at one level in regard to Adams I.

12   There was a different type of settlement in the USAA.  I

13   understood from the Court's Order that the Court was concerned

14   about that --

15           THE COURT:  Okay.  I don't --

16           MR. WEBER:  -- and I don't --

17           THE COURT:  Excuse me.  Go ahead.

18           MR. WEBER:  And so in our briefing to the Court, and

19   we put a footnote, there were a lot of other differences, and I

20   hesitate, and I certainly wouldn't here in this setting, but

21   obviously there are a lot of things individualized about

22   different cases as you move forward where plaintiffs believe

23   they have leverage on certain positions.  The Defendants may

24   believe, as litigation pushes forward, that they have leverage

25   on certain positions.  As Adams I progressed and the liability

1    questions in regard to the particular provisions before the

2    Court were being determined by the Arkansas Supreme Court,

3    obviously the risk was being lessened there, but there were

4    some other things going on, Your Honor, in regard to the

5    litigation that the Plaintiffs believed that we had more

6    leverage in that case for purposes of negotiation than we had

7    facing USAA.

8           One other point, Your Honor, that I would raise is

9    that simply in regard to the size, overall size of the cases,

10   the number of policies involved, the bigger the cases are,

11   obviously the cost of settlement starts to outstrip defense

12   costs.

13          I used to be a defense lawyer.  I don't know what USAA

14   and its counsel discussed as their motivations, but if you have

15   a small case that can be settled, as Adams I was, for

16   essentially what the defense costs would be in order -- if that

17   was going to be fought at all levels and appealed, if a

18   Defendant thinks, at least this is my view of the world from my

19   old defense-leaning days, if you think that you can resolve a

20   case basically for what your defense costs might be if you

21   pushed that forward, then you would, you would think about

22   doing that.  In regard to the USAA case, there's obviously a

23   lot more money at stake.  There's obviously a lot more reason

24   to fight for the Defendants' side, and so that litigation, when

25   you start to look at it, as to whether you are going to take a

1    settlement track, which is so many cases, and we cited a few of

2    them, or that settlements are supposed to be favored in class

3    actions in federal courts, if we have a case that we think we

4    can get a great settlement for the class, and I think this was

5    a great settlement, I would stand by this settlement where we

6    got what we did for the class members in this particular case,

7    when we can have that case and we can negotiate it and we can

8    take all of the risk off the table, that's a settlement that I

9    believe that we should put forward to a court for their

10   analysis and determination of whether it's fair, adequate and

11   reasonable, and those were the steps that we took.  But I do

12   believe there's -- that Adams I and the USAA case are

13   completely different creatures at so many different levels in

14   the negotiation, I believe it's unfair to say that they are the

15   exact --

16        THE COURT:  Yeah, I don't think you are saying,

17   though, you didn't rely upon or use Adams v. Cameron as

18   leverage in negotiation in settlement of this case.

19        MR. WEBER:  I don't, I don't believe that I -- I don't

20   believe that I said that, Your Honor, but I would say that,

21   that the Adams v. Cameron case is not anything that I believe,

22   and what the terms of that were going to be, I don't believe

23   that was ever something that was discussed with USAA.

24        THE COURT:  Well, I think we have covered this enough,

25   and you do eloquently state what your position was in regard to

1    the differences between the two, so that's helpful.  Okay.

2         Now, those are the questions that -- let me see -- I

3    had some other questions, but I think we will just -- I think

4    we've been at this for some time.  I think we will go -- I

5    know, Mr. Matthews, you have something you would like to say,

6    so you may proceed.

7         MR. MATTHEWS:  I do.  Thank you.  First, Your Honor, I

8    want clarification on my instructions about the in camera

9    presentation of the questions you had asked.  You want me to do

10   that in written filing or to give it to you orally --

11        THE COURT:  Written filing.

12        MR. MATTHEWS:  -- when we take a -- a written filing?

13   And how much time do I have to do that, Your Honor?

14        THE COURT:  Just whenever you can get it.

15        MR. MATTHEWS:  Thank you.  (Pause)  Do you want me to

16   proceed from the podium or here?

17        THE COURT:  Why don't you -- you can actually do it

18   from there.  My court reporter is the one who's always

19   concerned about where people speak from rather than me, so why

20   don't you do it from the podium?  It might be better.

21        MR. MATTHEWS:  Thank you, Your Honor.  May it please

22   the Court.  My name is David Matthews and I am honored to

23   represent the USAA defendants and their counsel.

24        I requested the opportunity to address you first

25   because it was my clients who invoked the jurisdiction of this

1    Court by properly removing this case from the Circuit Court of

2    Polk County where it had originally been filed.  As you must

3    know, my clients were shocked to receive your Show Cause Order

4    on December 21.  It became quite apparent to them that there

5    was a serious misunderstanding of the manner in which the Adams

6    vs. USAA case has been handled.  I hope our papers have

7    satisfactorily demonstrated to the Court that at all times my

8    clients believed and still believe they were operating not only

9    within the strict confines of the law but also the spirit of

10   the law.  Frankly, Your Honor, it would have just been plain

11   stupid to take the actions that they took in this case if they

12   thought what they were doing was unethical or an abuse of the

13   judicial process.  They all knew that everything they did would

14   ultimately be public record for all the world to see.

15          Class action settlements frequently draw objectors and

16   media attention as everyone knows.  My clients are confident in

17   the strengths and correctness of the legal positions they have

18   taken throughout this case, including their legal analysis and

19   citations offered in response to your Show Cause Order and the

20   Notice issued last week.  They are not afraid of the scrutiny

21   of their actions in this or any case.

22          My lawyer clients do not come to today's proceedings

23   with fear of a sanction, but, rather, with the hope of an even

24   greater importance.  They hope that today will be their chance

25   to redeem themselves in your eyes, to regain your confidence in

1    them, not only as good lawyers, but as good people, to restore

2    their good names with you, Your Honor, because it is obvious

3    from the content of your Show Cause Order that at least on

4    December 21st, you feel as you -- as though you and the Court

5    have been taken advantage of and you are clearly upset about

6    it.  The words you used in the Show Cause --

7             THE COURT:  Let me, let me just mention one thing.

8    This Show Cause Order was not entered flippantly.  It was not

9    entered without a lot of thought and consideration.  And I

10   think, as you have noted to me before, it's not anything

11   personal to me, and I have a high regard for a lot of very good

12   lawyers here, a lot of them who I've known for a long time and

13   have high regard for, but, you know, this is not about me.

14   It's about the appropriateness and use of federal jurisdiction

15   and about absent class members.  It's not about me,

16   Mr. Matthews.

17            MR. MATTHEWS:  We understand that, Your Honor.  But

18   the words that you chose for the Show Cause Order, which were

19   clearly deliberately taken, and after much thought, we all

20   certainly knew that, indicate that there's a disappointment by

21   the Court in the actions of the attorneys, and they want the

22   opportunity to correct that.

23            The Court acknowledged that it became aware of the

24   settlement of this case in state court through an article that

25   appeared in *Arkansas Business*.  That article was critical of

1    class action proceedings in general, class action legal fees in

2    particular, relied upon quotes from a nationally-known critic

3    of class action lawsuits, and from an attorney who was

4    attempting to represent four objectors at the final hearing on

5    the proposed settlement in Polk County.  Noticeably absent from

6    the article was any discussion of the relative merits and

7    defenses involved in this case, the length of time and money

8    spent by both sides in negotiating a settlement with the aid of

9    a nationally-recognized and respected mediator, nor did the

10   article accurately describe the benefits of the settlement to

11   the class members, but, instead, incorrectly stated that class

12   members would only get a portion of what was owed them, when in

13   reality, class members whose claim was filed within -- whose

14   claim was within the statute of limitations will receive

15   virtually 100 hundred percent of their alleged loss, if they

16   just fill out a short claim form.  Further, the article

17   expressed utter disdain for the integrity of the Arkansas state

18   court system suggesting that Arkansas circuit judges merely

19   rubber stamp class action settlements without subjecting

20   settlements to any meaningful review for fairness.  Frankly,

21   the article was disrespectful of Judge Jerry Ryan, but that

22   article clearly triggered the Court's concern that somehow

23   something had gone terribly wrong and demanded explanations.

24       The timing of the actions of the attorneys is crucial

25   to determining the actual facts rather than what they appear to

1    be or that lead to inferences the Court has drawn and commented

2    on.

3         So here are the facts.  The instant case was

4    originally filed in the Circuit Court of Polk County because

5    that's where the Plaintiffs live.  The state court has

6    concurrent jurisdiction with this Court in class action matters

7    and the Plaintiffs had every right to select a state court

8    forum.  There was nothing improper in the original filing.

9         By contrast, the Adams versus Cameron case or Adams I,

10   as you've referred to it, was originally filed in this Court by

11   the same Plaintiffs and some of the same lawyers.  The

12   Plaintiffs had good reasons for the filing that particular case

13   in federal court and they had every right to do so.

14        The USAA defendants instructed their attorneys to

15   remove the case against them to federal court under the Class

16   Action Fairness Act of 2005, and this was, of course, done in

17   January 2014.  This Court acknowledged in its Show Cause Order

18   that removal was proper.  That the removal was proper is

19   further established by the fact that the Plaintiffs did not

20   contest the removal or seek to remand it to state court.

21        Although none of my clients were attorneys of record

22   at the time of the Court's rulings in Adams vs. Cameron, my

23   clients Lyn Pruitt, Steven Goldman, and Wystan Ackerman were

24   extensively involved in the Court's Knowles vs. Standard Fire

25   Insurance case.  They were directly involved in presenting the

1    arguments on the issue of the amount in controversy.  After the

2    case came back from the United States Supreme Court, this Court

3    delivered a thorough and exhaustive discussion of the proper

4    matters to be considered by the Court in determining the good

5    faith estimate of the stakes when it denied the Plaintiffs'

6    Second Motion to Remand.  That decision was rendered by Your

7    Honor on August 2, 2013.  And the calculations of estimates of

8    the amount in controversy contained in the original and amended

9    affidavit supporting removal of the present case closely

10   tracked the factors that you have recited in Knowles.

11        The USAA defendants and their counsel removed the case

12   to your court in order to assure that their defenses, including

13   the question of whether to certify the class, would be

14   adjudicated and reviewed on appeal, if necessary, by federal

15   judges applying federal standards.  The issues of

16   ascertainability, commonality and predominance were issues USAA

17   wanted litigated under prevailing federal law.  The Class

18   Action Fairness Act contemplates and allows removal when the

19   amount in controversy exceeds $5 million.  There was nothing

20   improper in either the actions or motives of my clients in

21   removing the case to your court.

22        Each of my lawyer clients have declared under oath

23   that there had been no settlement discussions or even the

24   suggestion that settlement would be pursued before April 28,

25   2014, a full four months following the removal.  In fact, the

1    evidence is that the lawyers for both parties had extensive

2    discussions concerning the issues raised in the joint Rule

3    26(f) report filed on March 27, 2014, but settlement was

4    certainly not one of the topics.  Instead of talking

5    settlements, my lawyer clients were engaged in the preparation

6    of serious dispositive motions.  At the same time, the lawyers

7    for Plaintiffs were busy preparing and serving two separate

8    comprehensive sets of discovery documents.  In short, the

9    lawyers on both sides were gearing up to fully litigate this

10   case before Your Honor, but the focus changed on April 28,

11   2014.  The USAA defendants had decided they wanted to pursue

12   settlement through mediation and instructed my lawyer clients

13   to broach that subject with Plaintiffs' counsel.

14          As the Court knows, Rule 1.2(a) of the Arkansas Rules

15   of Professional Conduct provides that a lawyer shall abide by a

16   client's decision whether to settle a matter.  So on April 29,

17   after filing the dispositive motions that morning, counsel for

18   USAA spoke with counsel for Plaintiffs by phone at

19   approximately 4:00 p.m. about the possibility of engaging in

20   mediation.  That's the first day that the attorneys for the two

21   parties had any discussions concerning any effort to reach a

22   settlement of this case.  Three days later, the attorneys filed

23   a Joint Motion for Stay and informed the Court of their plans

24   to engage a mediator.

25          At the time of that filing, none of the lawyers on

1    either side had any idea what the ultimate settlement terms

2    would be.  The parties engaged former Federal Judge Layn

3    Phillips, a nationally-recognized mediator with extensive

4    experience in class action settlements, as a mediator.  Judge

5    Phillips conducted two separate mediation sessions in New York

6    City, the first on September 15, 2014, and the second on

7    December 3, 2014.  Although both sessions were productive,

8    neither session resulted in settlement.

9         The Court was notified of the status of the settlement

10   discussions, and by text order on December 15, the Court

11   extended the stay for continued negotiations.  The Court also

12   informed the parties there would likely be no more stays.  The

13   parties and their attorneys kept working toward a settlement.

14   Numerous e-mails, letters, and phone calls were exchanged and

15   progress was continuing, so the parties filed another status

16   report, a joint motion to extend the stay pending settlement

17   negotiations on March 16.  You denied that motion the next day

18   and lifted the stay.

19        Your March 17 text order further instructed the

20   Plaintiffs to respond to the pleading -- to the pending motion

21   for judgment on the pleadings by April 16 and instructed both

22   parties to file updated Rule 26(f) reports.  My lawyer clients

23   certainly understood from this Order that you intended for them

24   to paint or get off the ladder.  They also knew that you would

25   not look with favor on any more motions to extend for any

1    reason.  The crucial date in this timeline, excuse me, is

2    March 31, 2015.  Because after 11 months of hard work by both

3    sides, finally an agreement in principle on the basic terms of

4    the settlement was reached on that date.  Of course, the

5    settlement in principle was conditioned upon reaching agreement

6    on the detailed written Settlement Agreement and accompanying

7    documents.  It's important to note that this Agreement in

8    principle was reached four days after the stipulation of

9    settlement was filed in Adams vs. Cameron, although my clients

10   were not aware of that stipulation at the time.  But it was 49

11   days -- the agreement in principle was made 49 days before Your

12   Honor made any comments at all on its opinion of the terms of

13   the Cameron settlement.  In short, the agreement in principle

14   in the USAA case was not affected in any way by anything

15   contained in the Adams vs. Cameron settlement or in the review

16   of that settlement.

17          Furthermore, all of my lawyer clients have declared

18   under oath that they were unaware of the Court's concern about

19   the Cameron settlement until after your Order to Show Cause on

20   December 21, 2015.  One of the specific terms of the agreement

21   in principle was that it would be presented in the Circuit

22   Court -- thank you, Mr. Taylor.

23          Judge, I've been doing this 40 years and it still

24   scares me to death and I get cottonmouth.  I hope you don't

25   mind if I have a little drink.  I think everybody in this room

1    understands that.

2         One of the specific terms of the agreement in

3    principle was that it would be presented to the Circuit Court

4    of Polk County.  However, another specific term was that the

5    settlement was not approved for any reason, including reversal

6    on appeal, then the state court case would be dismissed without

7    prejudice, and if the Plaintiffs chose to litigate the case

8    further, it had to be done in federal court in the Western

9    District of Arkansas.

10        I direct the Court's attention to paragraph 44 of the

11   Stipulation of Settlement filed in Circuit Court.  Another

12   critical part of the Stipulation of Settlement is found in

13   paragraph 104.  That provision expressly provides, quote,

14   neither this stipulation nor the negotiations of the settlement

15   nor the settlement procedure nor any act, statement or document

16   related in any way to the settlement negotiations or settlement

17   procedures, nor any pleading or other document or action

18   related in any way to the stipulation shall be, one, offered

19   into evidence in the action or in any other case or proceeding

20   in support of or in opposition of a motion to certify a

21   contested class against the Defendant or, two, otherwise used

22   in any case or proceeding whatsoever in support or in

23   opposition to a motion to certify a contested class against

24   Defendants.

25        Paragraph 104 is entirely consistent, Your Honor, with

1    local Rule 7.3 that prohibits communication with the Court

2    concerning specific money demands and offers in settlement.  It

3    would have been inappropriate to inform the Court of the

4    specific terms of the settlement being negotiated in the event

5    the Settlement Agreement fell apart for any reason.

6         As the declarations of all of the attorneys recite,

7    the delay between March 31, 2015, and the filing of the joint

8    stipulation of dismissal was the time required to prepare and

9    agree upon the wording of the settlement documents and the

10   discussions about including Garrison Property and Casualty

11   Insurance Company in the settlement.  This also resulted in the

12   need to determine whether the sums of money identified in the

13   original affidavit in support of removal had included the

14   claims adjusted by Garrison.

15        It is also important for the Court to know that all of

16   the particulars for this class action settlement, including the

17   definition of the class participants, the time frame to be

18   covered, the formula for the amounts to be paid on the claim,

19   the claims-made method, the presentation of the settlement to

20   the state court, and the preservation of USAA's right to

21   litigate in federal court if settlement was not approved for

22   any reason were all -- this is a very important factor -- were

23   all negotiated and agreed upon before the issues surrounding

24   attorneys' fees were negotiated.  I'm told that this is this

25   usual and expected practice in class action cases and it was

1    followed in this case.

2           It's equally important for the Court to note that --

3    and recognize that the approval of a specific amount of

4    attorneys' fees was not a condition precedent to the final

5    approval of the settlement.  USAA agreed not to object to an

6    award of attorneys' fees and costs in the amount of one

7    thousand -- I'm sorry -- $1,850,000, but the amount of the

8    attorneys' fees, indeed even the method of calculating the

9    attorneys' fees was wholly up to Judge Jerry Ryan.  He could

10   have decided to utilize the Lodestar method of awarding fees,

11   reduce the amount in a manner he determined to be fair and

12   reasonable or have chosen to condition the attorneys' fees on

13   the amount of money actually paid to the class.

14          Furthermore, the amount of attorneys' fees and costs

15   ultimately to be awarded by the Court did not diminish the

16   amount of money available to the class in any manner.  After

17   the Court denied the last Motion for Stay and gave specific

18   instructions on the next filings it was looking for, the

19   lawyers took all of the steps available to them to minimize any

20   inconvenience to the Court while the settlement papers were

21   being prepared and signed.  For example, my lawyer clients

22   withdrew their pending Motions for Judgment on the pleadings

23   before the due date for the Response by the Plaintiffs, and the

24   parties did, in fact, file an updated Rule 26 report just as

25   you had ordered.

1          The lawyers signed a Stipulation of Class Action

2    Settlement to be filed in a new case to be filed in the Circuit

3    Court of Polk County on June 16.  The new case included the

4    same Defendants, same Plaintiffs as in the federal court, but

5    also named a new party, Garrison Property and Casualty

6    Insurance Company.  On June 19 the parties electronically filed

7    their Stipulation of Voluntary Dismissal Without Prejudice

8    pursuant to the provisions of Rule 41.  The Clerk's Order

9    dismissing the case followed on June 22 and Judge Jerry Ryan

10   conducted a hearing for preliminary settlement of the class on

11   August 26.

12          This is important also, Your Honor.  Judge Ryan was

13   specifically informed that the same Plaintiffs had originally

14   filed the same action in his court in December 2013 and that

15   the case was removed to federal court.  He was specifically

16   advised that the parties had engaged in extensive document

17   production and settlement negotiations while the case was

18   pending in federal court, and that the federal court case had

19   been dismissed and refiled in his court when the settlement was

20   reached.

21          Following the preliminary approval of the settlement,

22   requisite notices were mailed and Judge Ryan conducted a

23   hearing on the final approval of the settlement on December 16,

24   2015.  On December 18, Judge Ryan filed a -- signed a Final

25   Order approving the settlement.  He also issued a letter

1    opinion on that date addressing and overruling the purported

2    objections to the settlement that had been offered by attorney

3    Robert Trammell.  Ironically, those were the same objections

4    that Mr. Trammell had shared with the *Arkansas Business* that

5    appeared in the article that drew your attention to the case in

6    the first place.  The Final Order was entered in Polk County

7    Circuit Court on December 21, the same day that your Order to

8    Show Cause was entered.

9          Your Honor, I would ask you to consider that there is

10   no reported case from any circuit that gives any warning to any

11   lawyer practicing in the field of class action law that the

12   actions taken by these lawyers in this case could be found

13   improper, unethical, unpermitted or wrong in any way.  In fact,

14   just the opposite is true.  Similar settlements have been

15   handled in the same way even in the Western District of

16   Arkansas.

17         As I indicated at the outset, the lawyers on both

18   sides of this case knew at all times that you and Judge Ryan

19   and anyone else that was interested would know exactly how this

20   case evolved.  No one took any steps to hide their actions.

21   Judge Ryan was specifically informed that the case had been

22   originally filed in his court, removed, dismissed, and refiled

23   in his court for review.  Surely if these actions are obviously

24   wrong, he would have refused to hear the case.

25         There was no promise or guarantee that his review

1    would be any less rigorous than your review.  There was no

2    guarantee that he would not have applied the same rationale

3    that you did in the Eastwood case.  It turns out that Judge

4    Ryan did not apply a Lodestar evaluation of attorneys' fees,

5    but no one knew that he wouldn't when the settlement was

6    reached.

7            Your Honor, the facts and the citations to case law,

8    rules and scholarly treatises contained in our responsive

9    pleadings and declarations clearly prove that sanctions are not

10   warranted against Lyn Pruitt, Steven Goldman, Wystan Ackerman

11   or Steve Clancy.  I'm here today to respectfully ask you to

12   carefully consider the impact that the imposition of any

13   sanction, no matter how slight, will have on this these good

14   and fine lawyers.

15           As you can see from their declarations, they have each

16   spent their entire careers in ways that have led them to being

17   acknowledged to be among the best of our profession, serving in

18   important roles both in adjunct academia and in professional

19   organizations, yet a lifetime of achievement is now in jeopardy

20   of being tainted.

21           My clients all have national practices.  Often

22   applications for pro hac vice status require a recitation of

23   any sanctions, and thus a sanction in this case could

24   presumably be used to try to preclude their participation in

25   future cases in different courts.  Their very livelihood is at

1  stake.  The underlying purpose of sanctions, both under Rule 11

2  and the Court's inherent power, is to deter similar conduct in

3  the future, but the state of our jurisprudence at least

4  presently permits parties to take each of the actions that was

5  taken in this case.  There is no misconduct to deter.

6       If the Court believes that concurrent jurisdiction

7  should not exist or that rules should be put in place to

8  prevent parties from choosing freely the forum in which they

9  wish their cases resolved when they reach a settlement, then

10  there are certainly clearly ways to express that belief short

11  of permanently staining the reputation of these lawyers.

12       Thank you for listening to the arguments, Your Honor.

13  Thank you for your careful reading of all of the briefs.

14       THE COURT:  Thank you, Mr. Matthews.  Your arguments

15  are well stated, and most of them are in your briefs that you

16  have filed which I am also familiar with all of those

17  arguments.  Mr. Elrod?

18       MR. ELROD:  Thank you, Your Honor.  As the clients

19  stated in My Cousin Vinny, "I want that guy."

20       THE COURT:  Mr. Matthews has never been short of

21  words.

22       MR. ELROD:  So let me just begin by addressing

23  something that Your Honor spoke about earlier, and that is the

24  clear-sailing provision, as it's called, and the claims-made

25  settlement in this case.  What Your Honor is enunciating is an

1   ongoing debate in this country and in its jurisprudence in

2   terms of class action settlements and how they should or should

3   not occur that has nothing to do with whether what was done by

4   both parties in this case was permitted by the rules and

5   permitted by at least three difference circuits in terms of the

6   ability to do a claims-made policy.  Your Honor, I think it was

7   in Eastwood --

8           THE COURT:  Well, what -- if I could just state one

9   thing.

10          MR. ELROD:  Yeah.

11          THE COURT:  What Newberg says on that point --

12          MR. ELROD:  I'm sorry?

13          THE COURT:  What Newberg says on that point and the

14   cases -- in fact, there is a case out of the Western District

15   of Missouri by Judge Kays, the Stewart case, Judge Kays is the

16   Chief Judge of the Western District of Missouri.  He rejected a

17   Settlement Agreement on those terms and set out a clear opinion

18   about where there is a clear-sailing provision where there's a

19   claims-made settlement and that's why they say that those type

20   of settlements have the potential for collusion; therefore, a

21   Court should give very close scrutiny to those type

22   settlements.  That's the only reason I mentioned that --

23          MR. ELROD:  Yes, Your Honor.

24          THE COURT:  -- for that reason.  I mean, that is why

25   those type of settlements require a lot of scrutiny.

1    MR. ELROD:  Yes, Your Honor.  We understand that.

2    Surely there's no concern on your part that there was any

3    collusion in this case.

4    THE COURT:  I mean, I'm not, I'm not -- I didn't

5    review the settlement.  I haven't asked any questions.  I don't

6    plan to go in and ask the lawyers about it.  I don't know.  I'm

7    not saying that there was or there was not.  I would highly

8    doubt it.  I wouldn't expect it from these lawyers, but, you

9    know, that is why courts are required to conduct serious

10   scrutiny of settlements to determine whether that occurred.

11   MR. ELROD:  Yes, Your Honor.

12   THE COURT:  I'm not here to make a finding as to

13   whether or not there was any collusion in that settlement.

14   MR. ELROD:  We understand that.  And one of our goals

15   today has been to bring us back into its proper context, that

16   this is a sanctions issue, not a review of the quality or

17   the -- or the nature of the --

18   THE COURT:  Exactly.

19   MR. ELROD:  -- underlying settlement, but having said

20   that, Your Honor, the two are inextricably entwined with one

21   another.

22   THE COURT:  Well, that's the only way that the matter

23   arose in this court because the case had been dismissed, so

24   that that's why it's here.

25   MR. ELROD:  So I -- we have to talk, we have to talk

1    about the settlement, I mean, we just have to in my view.   My

2    clients are very proud of that settlement.   Here's what they

3    were faced with.   After a lot of hard work, after a lot of

4    document review, after spending some $150,000 with a damage

5    model expert, Saul Solomon in Houston, to go through the

6    records that were submitted by USAA to determine the range of

7    possible damages that were in this case and the range, as Your

8    Honor knows from the papers was somewhere between $2.2 and $4.2

9    million, somewhere in that range is what the estimates were --

10   We said 4.2.  They said 2.2.  The parties got back together.

11   They reviewed their numbers again and at the end of the day

12   after two one-day mediations in New York City and the

13   expenditure of a couple hundred thousand dollars or more, the

14   parties were able to come together on what they thought the

15   maximum take might be under a claims-made settlement.   The

16   number that they arrived at, as Your Honor knows, was an

17   estimate used for some purposes in the case, but it was a no

18   cap settlement.   If $5 million worth of people showed up, it

19   would be $5 million that would be paid.  So back to the

20   philosophical issue, my clients firmly believe, firmly believe,

21   and they are all very experienced class action plaintiffs'

22   attorneys, that their job is to provide a benefit to the class.

23   Once they provide that benefit to the class, assuming

24   appropriate notices, and there was a website in this case,

25   appropriate notices, appropriate claims administration, that

1    it's up to the members of the class to decide for themselves

2    whether or not they want to submit the appropriate claims form,

3    and I don't think this claims form in this case was very

4    difficult at all.  That's a philosophical view that they hold

5    dearly.  And they see absolutely nothing -- think about what

6    they were able to do in this case.  Through some very good

7    lawyering, and what you call Adams I, the Cameron case, with a

8    submission to the State Supreme Court, they changed the

9    practices of an industry.  They do that on occasion in their

10   day-to-day work.  That's what they do.  That's what class

11   action cases are about largely.  And in this case there

12   literally will be millions of dollars of advantage to Arkansas

13   consumers of industry -- of insurance products over the years

14   as a result of the work that they did in this case.

15          So we want to talk about philosophy of class action

16   cases and class action settlements.  I don't think we should

17   lose sight of the fact that they were able to change industry

18   practices through some very creative lawyer work, and they

19   should get credit for that.

20          The settlement issue.  Mr. Norman stated it very well

21   yesterday, and they were presented with the following options:

22   The first issue was whether they could do claims made or claims

23   paid.  Claims-paid was never put on the table.  So that was

24   never an issue for settlement.

25          So the second question becomes, the second option is

1    what can we do with that?  What they were able to do with it,

2    Your Honor, was to obtain a settlement that will provide one

3    hundred percent of reimbursement to the class who fall within

4    the five-year Statute of Limitations and in some cases 110

5    percent, more than a hundred percent for time value of money

6    and some other factors, that were thrown into the settlement

7    proposition.  So that's what they were able to do and that's

8    the situation they were faced with.

9          I know Your Honor practiced law for a lot of years.

10   Everybody in this room has been faced with settlement issues

11   and negotiations.  There's a whole bunch of different factors,

12   as Mr. Weber stated in his remarks to Your Honor, that go into

13   the ultimate question of whether a settlement is going to

14   occur, and if so, on what basis.  Part of it, quite frankly, is

15   who shows up on the other side.  I mean, the Robinson-Cole firm

16   is a nationally-known firm of good repute which specializes in

17   representing insurance companies, not defendants who are

18   defended by insurance companies but insurance companies,

19   headquartered in Hartford.  So the quality of the

20   representation of the defense side of this case at least

21   matched the quality of the representation on the Plaintiffs'

22   side in this case.

23         Judge Layn Phillips, who I've encountered before, is

24   an extraordinary mediator.  He's very expensive, by the way,

25   something in the range of more than $10,000 a day, well in

1    advance of that -- Forty?  $40,000 a day for his work.  So his

2    reputation is also on the line today, perhaps one could argue.

3           You know, the thing we really haven't addressed that

4    much in this case, even though it's addressed in the

5    declarations, is this whole issue of attorneys' fees.

6    Mr. Goldman stated in his most recent declaration the truth of

7    the matter, which is that the issue of attorneys' fees was

8    never, never broached until this class settlement was achieved.

9    Never.  It would have been improper to have done that.  It was

10   not done.

11          And the final point in regard -- and Layn Phillips

12   would never have permitted it to happen.  My understanding from

13   Mr. Norman and Mr. Weber and Mr. Mustokoff is that in most of

14   these cases, or many of these cases, the attorneys' fees are an

15   opened-ended issue.  They are simply submitted to the Court

16   with no agreement.  In this case, they were able to settle on

17   what you call a clear sailing provision in terms of what amount

18   would not be objected to well after the class settlement was

19   achieved, not even talked about, not even mentioned.  It would

20   have been improper to have done that.  And in this settlement,

21   Your Honor, as you know, whatever happens in terms of people

22   showing up to claim their money and at whatever level that does

23   occur at, the amount of the fees paid has nothing to do with

24   what the class will eventually recover, a very important fact

25   from an ethical standpoint that has been mentioned but probably

1     not emphasized enough.

2             So my clients are proud of the settlement that they

3     achieved.  They worked hard to get it.  And they are entitled

4     to be paid.  They provided benefit to the class, extraordinary

5     benefit.  This is not a coupon case.  And they are proud of it.

6     The issue of objectors, and I see Mr. Trammell back in the

7     courtroom.  We've known each other for a long time, Your Honor.

8     You know, maybe someday the federal system will address this

9     issue, but it hasn't addressed it yet.  So putting ourselves in

10    their position, $2- or $300,000 of skin in this game, at least

11    two mediation sessions, hundreds and hundreds of hours of work,

12    sincere representation of people who they believed were wronged

13    by the depreciation of labor, all of the work they put into

14    achieving the results that they achieved in front of the

15    Arkansas Supreme Court, both in this case and in Shelter, or in

16    Cameron and in Shelter, and they finally get a settlement after

17    a lot of hard work with an exquisitely, two exquisitely good

18    law firms on the other side, and somebody who is standing on

19    the sidelines suddenly shows up and says, you know, they should

20    have gotten a hundred cents instead of 85 cents.  And in the

21    federal system, my understanding is that's about all they have

22    to say in order to have the right to appeal the settlement

23    decision to the Eighth Circuit Court of Appeals.  Arkansas has

24    taken a much more restrictive view.  Our courts have said --

25            THE COURT:  Well, don't you think federal courts are

1    adept in handling sanctions -- I mean, handling objectors,

2    because I read some cases the other day where federal courts

3    imposed sanctions on objectors making totally unrealistic

4    demands, and I've had objectors here, and, you know, and give

5    them an opportunity to be heard and for the most part just

6    overruled the objections because they didn't have any merit.

7         MR. ELROD:  But they have the right, they have the

8    right to appeal, Your Honor, which is time --

9         THE COURT:  Yeah.

10        MR. ELROD:  -- which could put off a settlement and

11   actual disposition of the cash into the hands of the people who

12   deserve to have it for a year, year-and-a-half, two years.  The

13   now the famous Mr. Frank is involved in one right now in the

14   state of Minnesota, and that court has had some harsh words for

15   him, but, nevertheless, the disposition of money to the people

16   who deserve it is being held up for a long period of time.  But

17   Your Honor knows fully well what the Arkansas attitude is and

18   what our rules are, and that is that you have to successfully

19   intervene in the court and you have to prove in order to

20   intervene that the Court and the attorneys involved in the

21   litigation are not adequately taking care of the class, and so

22   the -- our system is different, and that truly was a motivator

23   to return to state court for settlement of this case as is

24   permitted, as I said earlier, Your Honor, by CAFA.

25             So here's the way we kind of -- here's the way I view

1     this situation.  We believe that everything that was done, all

2     of the filings were made with Your Honor, all of the

3     negotiations were done, the Rule 41 stipulated dismissal, the

4     movement to state court, all of those things viewed in their

5     own little silo were permitted, were permitted by the rules.

6     So setting aside for a moment the nature of the -- not having

7     any kind of a warning issued by any court that what they were

8     doing might be considered to be improper --

9          THE COURT:  Well, I thought -- you know, you've done a

10    really good job explaining your legal position.  I thought I

11    knew what it was before and I really understand it now, and

12    we've -- I'll have to make a decision on it.

13         MR. ELROD:  Yes, Your Honor.  But the ultimate point

14    that I'm trying to make is that so that all of these things

15    that were done properly sitting by themselves, there's

16    something when put you them all together in a basket together,

17    look at them, does that mean that, that there's something in

18    there that rises to sanctionable conduct?  We just can't

19    believe that that could be true.  And I understand from your

20    remarks and from our meeting in chambers that perhaps where

21    Your Honor is coming from is whether in their totality these

22    things were done for an improper purpose.  They were permitted

23    to be done.  They were done for the appropriate purpose.  There

24    was no detriment to the class.  There was no detriment to the

25    class.  There was no detriment to the class.  And we implore

1    the Court to let these good people go.  Let them keep their

2    reputations intact.  My clients also do national work.  They

3    are all over the United States of America, and they deserve to

4    carry out of this courtroom the good reputations that were

5    brought into the courtroom.  And we thank for your attention.

6            THE COURT:  Okay.  Thank you, Mr. Elrod.  Judge Moody.

7            MR. MOODY:  Yes.  And, Judge, may it please the Court.

8    I'm going to be brief, as I predicted, mainly because these

9    other lawyers have already covered the salient points and also

10   because my bladder is not as strong as it used to be.  I know

11   that it's a given that first impressions are sometimes

12   misleading, and it's important for any Court to fully develop

13   all of the facts before making a final decision, and you've

14   done exactly that.  You've taken this seriously and you've

15   given the parties an opportunity to respond, which they have

16   taken seriously and done, done so with pretty extensive briefs.

17           As you have mentioned, there is a thousand pages

18   already in this record and probably more to come.  And I know

19   this is important for you, and I can tell from the breadth and

20   depth of your questions how interested you are in doing this

21   right, but I would be remiss if I didn't tell you that this is

22   also a serious matter for Mr. Engstrom.  I know you've said

23   you're not taking this personal, that you know these lawyers

24   and know their reputation, but I never said this in any of the

25   papers that we submitted, but, you know, Mr. Engstrom has been

1    in practice for 40 plus years and he is very proud of the

2    reputation that he has earned by being a square-shooter, and I

3    can personally attest because I've had cases where we've been

4    on both -- the same side, on the opposite sides, and he's

5    appeared in court, and I can honestly say that I've never had a

6    hint that he's ever engaged in any unethical conduct.  He had a

7    limited role here, but he doesn't want to be treated any

8    differently than any of the other Plaintiffs' lawyers.  And to

9    the extent that he was aware of what was done, he believes that

10   all of these lawyers on both sides did what they thought was

11   the proper procedures in following the law, the rules, and the

12   Orders of the Court, and that they objectively thought that

13   they were doing what was best for the class, which was their

14   client, to get them the most money within the protection of

15   Rule 23, whether it be by your supervision or by the state

16   court.  And they are proud of the settlement and they are

17   worthy of the attorney fee that they sought.

18          Now, I'm just going to mention a couple of things.  I

19   know the Court was concerned about forum shopping, and I know

20   that was covered in the briefs, but I just want to remind the

21   Court that -- the Court pointed out that there are cases where

22   forum shopping was brought up in the middle of a removal from

23   federal court, but here the Plaintiffs wanted this case in

24   state court from the beginning, I mean, and it had legitimate

25   state issues.  It involved state law, state property owners.

 1   There was no reason to think that Judge Ryan wasn't capable of

 2   handling it, but that was where they preferred it to be, and it

 3   was only because it was removed here that it left his

 4   concurrent jurisdiction.  So it wasn't unnatural for them to

 5   want to negotiate a settlement that would take it back where

 6   they -- where it had its inception and where they wanted it all

 7   along.  Now, with respect to why they moved it back, and

 8   Mr. Elrod has referred to the objectors and that was one of the

 9   main or the driving reason for doing that, and it was mainly

10   because of the delay that occurs when an objector appears in

11   state court and can tie it up, so then the class members don't

12   get paid in a timely fashion.  And that was a legitimate

13   concern and not just a concern.  It turned out to be a reality

14   when objectors showed up in Judge Ryan's court.

15          So for all of those reasons, and because it appears

16   that these lawyers objectively and subjectively believed that

17   they were doing the right thing for their clients in obeying

18   the law and obeying the Court, that sanctions just don't seem

19   to be appropriate in this case.  And thank you for listening to

20   me.

21          THE COURT:  Thank you, Judge Moody.  It's a pleasure

22   to have you here.

23          Let me tell you the next steps that I'm going to

24   handle here.  Mr. Matthews, you are going to make a submission,

25   and what I'd ask you to do is do it in writing and send it to

1      PKHinfo at that website, I mean, that e-mail address,

2      PKHinfo@arwd.uscourts.gov.  That's my e-mail address that I

3      receive e-mails.  If you'll just send it there.

4              MR. MATTHEWS:  May I call Miss Jane Ann later and get

5      that slower?

6              THE COURT:  You can ask Jane Ann or Jamie.  I may have

7      even given you the wrong e-mail address.  I don't want this to

8      go to the wrong e-mail address.

9              MR. MATTHEWS:  No, sir, you and me both.

10             THE COURT:  Well, anyway, let me tell you what I

11     intend to do is take this matter under advisement.

12             Let me give you an idea about what my schedule is.  We

13     spent all week last week in a habeas death penalty case in

14     Texarkana all week.  Next week we've got a trial all week in

15     Fayetteville, a Title 7 case, and then another trial the

16     following week.  I don't anticipate that I am going to have a

17     decision for -- at the earliest two or maybe three, four weeks,

18     so the one thing I do want to do, I'm going have the court

19     reporter give me a transcript of the hearing today because the

20     lawyers made some good arguments, and so I need an ability and

21     opportunity to be able to review that as well as the briefs, so

22     it will be some -- I wish I could get to the decision sooner,

23     but just we're going to be tied up in trials for two weeks, and

24     this is going to require some time and attention to get -- make

25     a decision, to get an Order out, so the matter will be taken

1    under consideration and the Court will be in recess.

2         MR. MATTHEWS:  Your Honor, may I ask one further

3    question?  You've told us that we have the opportunity to

4    object to the proffered amicus brief.  In lieu of that, if we

5    wanted to simply address in a brief here the questions that you

6    had asked about the impact of the Thatcher case, would we be

7    permitted to do that?  I know you've got --

8         THE COURT:  I think I've got enough.  I mean, I think

9    I understand Thatcher enough.  I really don't need any post

10   hearing briefs on this.  I think I understand all what it is.

11   So we have a pre-trial conference tomorrow in the case that's

12   beginning next week, so I will devote a little attention to

13   this today, but I don't have much time.  There are seven

14   motions in limine filed in that case, so I've got to go deal

15   with that now.

16        MR. MATTHEWS:  Very well, Your Honor.  Thank you.

17        THE COURT:  And I've got a huge record here, and so we

18   will get a decision as soon as we can and as timely as we can.

19   So I thank you and the Court will be in recess.

20        (End of proceedings.)

21

22

23

24

25

1                        C E R T I F I C A T E

2

3    State of Arkansas    )
                          )
4    County of Sebastian )

5

6        I, Rick L. Congdon, a Registered Merit Reporter, and

7    Official Court Reporter for the United States District Courts,

8    Western District of Arkansas, do hereby certify that the

9    foregoing transcript, taken before me at the time and place

10   herein designated, consisting of pages 2 through 85, was taken

11   down by me in machine shorthand and then transcribed via

12   computer, either personally or under my supervision, and that

13   this transcript is a true, correct, and complete transcript of

14   said proceedings as reflected herein.

15       Signed this 29th day of February, 2016, in the City of

16   Fort Smith, County of Sebastian, State of Arkansas.

17

18                              */s/  Rick L. Congdon*
                                **RICK L. CONGDON, RMR, FCRR**
19                              OFFICIAL COURT REPORTER
                                U. S. DISTRICT COURTS
20                              WESTERN DISTRICT OF ARKANSAS

21

22

23

24

25