IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MARK I. and KATHERINE S. ADAMS,
individually and on behalf of all others
similarly situated                                                    PLAINTIFFS

v.                                          No. 2:14-CV-02013

UNITED SERVICES AUTOMOBILE ASSOCIATION;
USAA CASUALTY INSURANCE COMPANY; and
USAA GENERAL INDEMNITY CO                                DEFENDANTS

## OPINION AND ORDER

Before the Court is the matter of potential sanctions against Respondents D. Matt Keil,

Jason Earnest Roselius, John C. Goodson, Richard E. Norman, Stevan Earl Vowell, Timothy J.

Myers, W. H. Taylor, William B. Putman, A. F. "Tom" Thompson, III, Kenneth (Casey)

Castleberry, Matthew L. Mustokoff, R. Martin Weber, Jr., and Stephen C. Engstrom (collectively,

Plaintiffs' counsel); and Lyn Peeples Pruitt, Stephen Edward Goldman, and Wystan Michael

Ackerman (collectively, "Defense counsel").[1]

I.      **Background**[2]

On January 15, 2014, this case was removed to this Court from the Circuit Court of Polk

County, Arkansas.  During the course of this putative class action, Respondents engaged in

protracted settlement negotiations.  After agreeing on the terms of a class settlement, on June 19,

2015, Respondents stipulated to dismissal of the action from this Court and immediately filed a

new action in the Circuit Court of Polk County, along with a motion to certify a class and approve

---

[1] The Court notes that Stephen O. Clancy was previously a Respondent in this matter, but that Mr. Clancy was specifically found not responsible for the violations in the Court's April 14, 2015 opinion and order.  (Doc. 61, p. 19, n.13).

[2] The background for this order is more fully set out in the Court's April 14, 2015 opinion and order (Doc. 61), and for the most part will not be restated here.

their proposed class settlement. Because Arkansas courts have a lenient approach to class certification and require no heightened attention when a class is certified for settlement purposes, the class was certified and over-noticed. Final approval was given in the state court to a claims-made settlement that resulted in a 4% claims rate against the estimated settlement value of $3,445,598 and $1,850,000 in fees and expenses awarded to Plaintiffs' counsel through a quick-pay provision, benefitting Plaintiffs' counsel and Defendants at the expense of the class. On December 21, 2015, the Court entered an order for all Respondents to show cause why sanctions should not be imposed pursuant to Federal Rule of Civil Procedure 11(b)(1). The Court issued an additional notice on February 11, 2016, advising Respondents that sanctions pursuant to the Court's inherent disciplinary authority were also under consideration. Respondents filed briefs, affidavits, and other supporting documents, and a hearing was set for February 18, 2016. On April 14, 2016, the Court issued an order finding that Rule 11 was violated when Respondents stipulated to dismissal of this action for the improper purpose of seeking a more favorable forum and avoiding an adverse decision. The Court also found that Respondents' use of properly-attached federal jurisdiction as a mid-litigation bargaining chip was an abuse of the judicial process. The Court further determined that the conduct of at least some Respondents was characterized by bad faith, and that sanctions were warranted. So that Respondents might have the notice that is essential to due process, the Court listed the sanctions it was considering and set a hearing at which Respondents could be heard with respect to those sanctions, which included both traditional sanctions and injunctive sanctions.[3]

---

[3] The Court's April 14th, 2015 order and opinion put Respondents on notice of the following potential sanctions:

(1)     for each Respondent whose violation of Rule 11 was characterized by bad faith, in any class action in the federal courts of Arkansas in which the Respondent has entered an appearance or is otherwise representing an involved party with respect to the action, in

Respondents submitted supplemental briefs and affidavits in response to the Court's order, and on June 24, 2016, the Court held a hearing on the issue of whether and what sanctions should be issued. At the close of that hearing, the Court took the matter under advisement and now issues this opinion and order.

## II.      Sanctions Analysis

The sanctions process is a fluid one. After the Court determined in this case that a violation of Rule 11 occurred and that the judicial process had been abused, it was obligated to give notice of the sanctions it intended to impose, as well as an opportunity to be heard. *Sec. Nat'l Bank of Sioux City, Iowa v. Day*, 800 F.3d 936, 945 (8th Cir. 2015). Respondents availed themselves of the opportunity to be heard by presenting factors that were not previously presented to the Court, and addressing specific concerns identified by the Court. One result of the fluidity in this process is that corrections to the Court's prior opinion and order may be necessary. Therefore, to the extent any findings from this Court's previous opinion and order are controverted by this opinion and order, this opinion and order controls.

To that end, at the June 24 hearing the Court was more fully informed about the role of

_____

which a motion for approval of a class settlement is filed, the requirement that the Respondent file a notice along with the motion for settlement that the Respondent has previously been sanctioned for improper conduct in connection with a class action settlement agreement;

(2)      for each Plaintiff's counsel whose violation of Rule 11 was characterized by bad faith, in any putative class action in the federal courts of Arkansas in which that attorney files a motion to be appointed class counsel, or in any pending class action in which that attorney has already been appointed class counsel, the requirement that that Respondent file a notice that he has violated Rule 11 by dismissing a putative class action for the improper purposes of seeking a more favorable forum or escaping an adverse decision; and

(3)      for any Respondent whose violation is not characterized by bad faith, an admonition, reprimand, caution, censure, or similar sanction.

(Doc. 61, pp. 23–24).

3

Respondent Stephen C. Engstrom in this matter.  Mr. Engstrom's role was to argue the depreciation of labor issue before the Arkansas Supreme Court, which legal issue was central to the merits of this and other cases.  Counsel for Mr. Engstrom clarified that while Mr. Engstrom "continued to follow the case," and while he was aware that the parties intended to return to state court for settlement, Mr. Engstrom was not consulted about that decision.  (Doc. 77, pp. 17:23–18:7).  The Court has previously explained that minimal participation does not absolve a Respondent of responsibility for a Rule 11 violation.  (Doc. 61, p. 18).  In light of this additional information, however, it is difficult for the Court to distinguish Mr. Engstrom's role from that of Stephen O. Clancy, insofar as Mr. Engstrom's substantive participation in the matter following his argument before the Arkansas Supreme Court largely seems to have ended.  Though it remains the opinion of the Court that a participating attorney's silence in the face of improper conduct is not objectively reasonable, the Court is left with the impression that Mr. Engstrom's continued participation in this matter was much more limited than that of his co-counsel, and even describing that participation at the time of the misconduct as "minimal" may overstate it.  On the evidence before the Court, Mr. Engstrom bears no responsibility for the violation in this case.

Similarly, in its prior opinion and order the Court identified silence before the state court on the "penalty of perjury" issue as evidence that the actions before this Court of Respondents Vowell, Putman, Taylor, Keil, and Ackerman were characterized by some degree of bad faith. (Doc. 61, pp. 22–23, n.15).  At the June 24th hearing, Plaintiffs' counsel called to the Court's attention the actual objections made before the state court, and later filed those objections for the Court's review.  (Doc. 76).  Regardless of the merits of those objections, in light of the lack of clarity in their presentation of the penalty of perjury issue, some confusion before the state court is understandable.  Additionally, Respondent Ackerman has pointed out that he was not allowed

4

to participate in the hearing before the state court.  (Doc. 75-4, ¶ 20).  The conduct of Respondents at the December 16, 2015 state court hearing is not sufficiently weighty evidence of bad faith for the Court to continue to rely on it in finding bad faith characterized Respondents' misconduct.[4]

The Court also identified the updated Rule 26(f) report (Doc. 31), which failed to address either the settlement or the parties' intended dismissal (topics easily addressed in such a report when explaining why, for example, a long discovery period is not desired) as evidence that Respondents deliberately concealed their intent to dismiss and insulate the case from this Court's review, and therefore as evidence of bad faith on the part of Respondents Mustokoff and Ackerman.  (Doc. 61, pp. 22–23, n.15).  Though the Court finds the innocent explanations offered by Respondents for the Rule 26(f) report less convincing than the explanations offered regarding the state court hearing, there is now at least a greater question as to whether the filing of the Rule 26(f) report was an act of bad faith.  This Court is mindful of the admonition that "judges must be especially careful where they are both prosecutor and judge."  *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 40 (1st Cir. 2005).  Therefore, the Court will give the benefit of the doubt to Respondents on this issue, and will not attribute the filing of the misleading Rule 26(f) report to malice.  The Rule 26(f) report is insufficiently weighty evidence of bad faith for the Court to continue to rely on it in finding bad faith characterized Respondents' misconduct.

Other issues raised at the hearing and in briefing border on argument as to why the Court should reconsider its finding that Rule 11 was violated and the judicial process abused.  Though these arguments do not require the Court to retreat from those findings, the arguments are of

---

[4] Additionally, because it no longer appears to the Court that these Respondents violated their ethical duty of candor to the state court, the Court does not believe this constituted misconduct under the Federal Rules of Disciplinary Enforcement, and will not refer this matter for investigation and enforcement.

sufficient import that they must be addressed before the Court imposes sanctions.  As an initial matter, the Court rejects Respondents' argument that they reasonably believed their conduct was proper because they have not previously been sanctioned for it.  It is doubtful that in any cases where Respondents stipulated to dismissal so they could file a new lawsuit in state court to certify and settle a class action on terms negotiated in federal court, the presiding judges had any real awareness of what happened post-dismissal.  Stipulations of dismissal are self-effecting.  *Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1189 (8th Cir. 1984) ("Caselaw concerning stipulated dismissals under Rule 41(a)(1)(ii) is clear that the entry of such a stipulation of dismissal is effective automatically and does not require judicial approval.").[5]  This means no order is necessary for the case to substantively end on the terms of the stipulation.  Any such order could at most have an administrative effect limited to docket recordkeeping.  It is not reasonable to read a pro forma or text-only order of dismissal that ultimately has no legal effect as a judicial ruling condoning Respondents' dismissal tactic.  Additionally, courts possess a great amount of discretion in managing their own dockets.  In cases of parallel litigation, a federal court's decision to delay or stay an action pending before it while a parallel state action proceeds toward an outcome that will ultimately resolve the federal action and require its dismissal implicates a different analysis than this case, where the issue is Respondents' dismissal of a pending federal action in

---

[5] This principle, that voluntary dismissal terminates a case without any action by the court, is the principle reiterated by *Foss v. Fed. Intermediate Credit Bank of St. Paul*, 808 F.2d 657 (8th Cir. 1986), and *Safeguard Bus. Sys., Inc. v. Hoeffel*, 907 F.2d 861 (8th Cir. 1990).  Plaintiffs' counsel incorrectly cite these cases as endorsing their position that a stipulation of dismissal may be had for the purpose of mid-litigation forum shopping.  As is the case with their reliance on *Kern v. TXO Production Corp.*, 738 F.2d 968 (8th Cir. 1984) (discussed *infra*), Plaintiffs' counsel ignore that these opinions were issued many years before *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999), and *Thatcher v. Hanover Insurance Group, Inc.*, 659 F.3d 1212, (8th Cir. 2011), the Eighth Circuit cases that most clearly identify seeking a more favorable forum and avoiding an adverse decision as improper purposes for dismissal.

which they have reached agreed class settlement terms so that they could get approval of those desired settlement terms in a state forum.

Plaintiffs' counsels have also rehashed the argument that the 2003 amendments to Rule 23 specifically allow the conduct which occurred here, that the Class Action Fairness Act of 2005 ("CAFA") did not specifically disallow the conduct, and that therefore the conduct cannot have been unreasonable. This argument is made to show that because Respondents relied on a reasonable interpretation of the law, their conduct was not characterized by bad faith, though if the Court were to agree with it, it would necessitate a reexamination of whether a Rule 11 violation occurred at all. In essence, Plaintiffs' counsel argue that in amending Rule 23, "the purpose of the rule change was to permit parties to divest federal courts of review of putative class actions if they are uncertified," and "the rule-makers allowed parties to divest federal courts of jurisdiction over uncertified class actions," (Doc. 77, p. 9:10-12; 10:10-11). Plaintiffs' counsel infer too much from the difference in the Rule as proposed and the Rule as amended. They correctly note that after the comment period, the proposed Rule was changed so that a plaintiff in a putative class action could dismiss his case without prior Court approval. (Doc. 77, pp. 9:25–10:3; 10:5-8). They point out that the proposed version of the Rule, which ultimately was not adopted, required the court's permission before class claims, issues, or defenses could be resolved by a putative class representative. The advisory committee notes for the 2003 amendments juxtapose the interpretation of the superseded version of the Rule—"requir[ing] court approval of settlements with putative class representatives that resolved only individual claims"—with the amended version—"requir[ing] approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment. Read in the context of the Rule as proposed, this

juxtaposition does not reveal that the advisory committee intended to allow parties to divest federal courts of jurisdiction or review over uncertified class actions so that they could be certified and settled in another court.  Rather, it reveals that the amendment was made to allow putative class representatives to settle their individual claims without court approval before any class action was certified.  It must be noted that settlement of individual claims without court approval is not what happened in this case, where Respondents negotiated a class settlement in this Court then stipulated to dismissal, effectively remanding the case to state court for class certification and review of the settlement.

An interpretation of the 2003 amendments that allows parties to divest the Court of jurisdiction in this way is unreasonable.  It is well-settled, both as a matter of federal law and of Arkansas law, that once a court's subject matter jurisdiction attaches, subsequent events do not divest the court of jurisdiction.  *See Mullen v. Torrance*, 22 U.S. 537, 539 (1824) ("It is quite clear, that the jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, *it cannot be ousted by subsequent events*." (emphasis added)); *Estes v. Martin*, 34 Ark. 410, 419 (1879) ("It is the universal rule, so far as we know, in the courts of the various states, and in the United States courts, that where a court once rightfully acquires jurisdiction of a cause, it has the right to retain and decide."); *accord St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 293 (1938) ("Thus events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached.").  In the face of such well-settled law, for it to be reasonable to believe that the change in Federal Rule of Civil Procedure 23 was intended to abrogate this bedrock jurisdictional principle, some clear indication of this intent is necessary.  One possible implication to be drawn from a difference between the

Rule as proposed and as adopted does not suffice.

Nor can it be the case that the 2003 amendments to Rule 23 divest the Court of its authority to review a case in which the parties are stipulating to dismissal in order to carry out its responsibilities to putative class members.

> Notwithstanding the 2003 addition of the reference to 'certified' classes in Rule 23(e), at least some courts have continued to require approval of voluntary, non-prejudicial dismissals sought prior to any ruling on class certification—more specifically, to address whether notice to the putative class is necessary to prevent prejudice. . . . The factors these courts have considered relevant in deciding whether notice is required include the likelihood that putative class members are aware of the litigation, and whether they have relied on prosecution of their claims by the named plaintiff . . . ; and whether there is any evidence of collusion between the named plaintiff and the defendant . . . .

*Bray v. Simon & Schuster, Inc.*, No. 4:14-CV-00258-NKL, 2014 WL 2893202, *2 (W.D. Mo. June 25, 2014) (citations omitted).  Even in those jurisdictions which did not require court approval to dismiss individual claims under the old Rule 23(e), the court was required "to use its Rule 23(d) supervisory powers to protect the interests of the potential class members."  *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir. 2001) (citing *Shelton v. Pargo*, 582 F.2d 1298, 1310 (4th Cir. 1978)).  In light of the long history of federal court authority and obligation to protect putative class members, the 2003 amendment to Rule 23—an amendment intended to allow a putative class representative to settle his individual claims without court approval—cannot reasonably be read to have divested the Court of authority to review a stipulation of dismissal of a putative class action.

Interpreting the 2003 amendment to Rule 23 as allowing parties to do what Respondents did in this case is even more unreasonable when the Rule is read in light of the passage of CAFA. To read the Rule as allowing parties to evade federal review by stipulation would "run directly counter to CAFA's primary objective: ensuring 'Federal court consideration of interstate cases of

national importance.'" *Standard Fire Insurance Company v. Knowles*, --U.S.--, 133 S.Ct. 1345, 1350 (2013); *see also* Reply Brief for Defendants-Appellants, *Thatcher v. Hanover Ins. Group, Inc.*, 659 F.3d 1212 (8th Cir. 2011) (No. 11-1610), 2011 WL 2353837, *13 (citing *Shappell v. PPL Corp.*, Civil No. 06-2078 (AET), 2007 WL 893910, *3 (D.N.J. March 21, 2007) ("Additionally, the Congressional intent behind CAFA would be undermined by such strategic use of the rules.")). In short, nothing in the legislative history of CAFA or the amendment process of Rule 23 indicates that either CAFA or the Rule allows that parties may stipulate to dismissal of a putative class action properly removed to federal court for the purpose of certifying and settling that class action in a state court.

Without the cover of an unreasonable, and likely post-hoc, interpretation of Rule 23 and CAFA, Respondents are left to contend with the unequivocal statement of law in the Eighth Circuit that "a party is not permitted to dismiss merely to escape an adverse decision nor to seek a more favorable forum." *Thatcher v. Hanover Insurance Group, Inc.*, 659 F.3d 1212, (8th Cir. 2011) (quoting *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999)). These purposes are identified as improper, and the statement of law is not limited only to cases of voluntary dismissal under Rule 41(a)(1)(A)(i) or motions to dismiss under Rule 41(a)(2). Plaintiffs' counsel cite to *Kern v. TXO Production Corp.*, 738 F.2d 968 (8th Cir. 1984), arguing that dismissal to escape an adverse decision or seek a more favorable forum cannot be improper because otherwise the court in *Kern* would have issued sanctions when a motion to dismiss was made for that purpose. Plaintiffs' counsels' reliance on decisions like *Kern*, *Foss*, and *Safeguard Bus. Sys., Inc.*, does not help their case. "One of the central purposes of Rule 41(a) is to permit the plaintiff to dismiss an action and start over again." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1107 (11th Cir. 2004) (quoting 8 Moore's Federal Practice § 41.40[5][c]). Respondents did

not "start over again" after their dismissal from this Court. Rather, they took a case that they had fundamentally resolved in this Court and continued it in another Court. With respect to sanctions not issuing in those cases, Plaintiffs' counsel should recognize the difference between unilaterally taking an improper action and transparently making a good-faith argument to a court that such an action is not improper and should be allowed. Here, Respondents did not invite the Court's review of their dismissal tactic and make good-faith arguments for its propriety but instead effected their dismissal in a manner calculated to evade review. Plaintiffs' counsel also ignore that *Kern* was decided fifteen years before *Hamm* and twenty-seven years before *Thatcher* (and so without the benefit of the legal analysis in those opinions), and that the purpose of dismissal was not an issue raised before the *Kern* court. Plaintiffs' counsel are doubtless aware that courts often do not address issues not called to their attention. The Court again rejects the argument that Respondents' conduct was proper, and does not depart from its finding that Rule 11 was violated. Nor does the Court see any reason to depart from its finding that the judicial process was abused by Respondents' mid-litigation forum shopping tactics, and therefore sanctions may be imposed pursuant to the Court's inherent authority.[6] Good faith errors in an area of complex and unclear law often do not deserve sanctions. *See, e.g.*, *Wolfchild v. Redwood County*, --F.3d--, 2016 WL 3082341, *6 (8th Cir. June 1, 2016). But the principle articulated in *Hamm* and *Thatcher* is nothing if not simple and clear. Any complexity in this sanctions analysis arises only through addressing Respondents' argument that their purpose was proper despite that simple and clear statement of

---

[6] As the Court set out in its prior opinion and order, the inherent sanctioning authority is not mutually exclusive with the Rule 11 sanctioning authority. (Doc. 61, pp. 6–7). And again the Court notes that the sanctions it is imposing under Rule 11 are adequate sanctions, but to the extent those sanctions exceed the Court's Rule 11 authority, they are nevertheless sanctions appropriate to vindicate judicial authority, and are therefore also imposed pursuant to the Court's inherent authority.

law.

These issues addressed, the Court will continue with its sanctions analysis.  In deciding whether and what sanctions to impose, the Court is guided primarily by the factors identified in its prior opinion and order—"the wrongdoer's history, experience, and ability, the severity of the violation, the degree to which malice or bad faith contributed to the violation, and other factors." *Pope v. Fed. Express Corp.*, 49 F.3d 1327, 1328 (8th Cir. 1995).  The Court has discussed the facts involved in this violation over the course of this matter sufficiently enough to leave little doubt that the severity of the violation was great.  Respondents engaged in improper mid-litigation forum shopping in a manner calculated to evade federal review and prevent the Court from carrying out its obligation to putative class members.  This factor weighs in favor of sanctions.  The Court has also read the affidavits and declarations filed in this matter to familiarize itself with the history, experience, and ability of Respondents.  On the one hand, with the exception of the misconduct the Court has noted in these proceedings, Respondents do not appear to have a history of violating the Rules, and this weighs against sanctions.  On the other, in light of Respondents' experience, they all ought to have known, or did know, that this conduct was improper, and this weighs in favor of sanctions.  When the Court balances these factors, Respondents' history and experience do not strongly weigh in favor of or against sanctions.

Of the factors explicitly identified in *Pope*, the primary factor for the Court to consider is the degree to which any given Respondent's misconduct here was characterized by bad faith.  As pointed out above, some of the evidence of bad faith previously identified by the Court no longer appears to be as weighty.  However, there is still the matter of any Respondent's knowledge of the controlling authority of *Hamm* and *Thatcher*.  Respondents Keil, Goodson, Roselius, Weber, Norman, Goldman, Ackerman, and Pruitt all knew of the holding in *Thatcher*, and therefore of the

holding in *Hamm*.  (Doc. 61, pp. 20–21).[7]  This is weighty evidence that the conduct of each of these Respondents was characterized by bad faith.  Of these Respondents, Ackerman, Goldman, and Pruitt have all identified mitigating factors.  As Defense counsel, their representative duty was to their client, USAA.  USAA directed these Respondents to settle, and the Court has no doubt that USAA was well aware that other insurance class actions of this type had been dismissed and settled in Arkansas state courts using this dismissal tactic, or some variation thereof.  This directive put Defense counsel between the proverbial rock of asking the Court to do something they knew it could not do—grant a motion to dismiss so they could pursue this action in a more favorable forum and avoid an adverse decision—and the hard place of violating their ethical duty to settle as directed by their client.  This is not to say that Defense counsel's failure of candor to the Court is excusable, and had this been the first instance that litigants used a state court action to certify and settle a federal putative class action, this might not be enough to protect Defense counsel from a finding of bad faith.  They would have been expected to tell USAA that no settlement could be achieved on these terms because it would violate the law.  However, with their client aware that other insurers had settled class actions in Arkansas without negative consequences using this same tactic, the Court is left with the impression that the misconduct of Ackerman, Goldman, and Pruitt was characterized more by a sense of helplessness in the face of ethical obligations to their client

---

[7] In its prior opinion and order, the Court wrote "the mere fact that Respondents now know that their conduct in stipulating to dismissal for the purpose of seeking a more favorable forum and avoiding an adverse decision is unequivocally improper, they are unlikely to repeat this misconduct."  (Doc. 61, p. 23).  Plaintiffs' counsel appear to have latched onto this phrase—particularly the use of the word "now"—as an indication that the Court recognizes implicitly "that in reality there was no bad faith."  (Doc. 77, p. 14:10-23).  There is no question that several of the Respondents discussed in that portion of the Court's prior opinion and order, including several of Plaintiffs' counsel, knew at the time the stipulation was filed that dismissal for those purposes was improper.  The Court did not intend to implicitly suggest that there was no such knowledge, and no bad faith, and explicitly rejects that implication.

than it was by bad faith.  *Accord Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988) ("Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously.").  In the absence of bad faith, the misconduct of these Respondents appears to be on the same level as that of Respondents Vowell, Putman, Taylor, Mustokoff, Myers, Thompson, and Castleberry.  Respondents Keil, Goodson, Roselius, Weber, and Norman do not have these same mitigating factors acting in their favor, and the Court sees no reason to depart from its finding that their misconduct in this case was characterized by bad faith.

In addition to the factors explicitly identified in *Pope*, the Court may consider other factors in exercising its discretion to impose sanctions, and the Court will again give consideration to the deterrent purpose of Rule 11.  For those Respondents whose misconduct was not characterized by bad faith, the Court departs from its previous finding that some sanction is necessary to deter their future misconduct and vindicate judicial authority.  A finding that these Respondents violated the Rule will be sufficient deterrent to their own future misconduct, and the publicity this case has received and changes the Court is instituting to its management of putative class actions will deter other attorneys from misconduct.

For those Respondents whose misconduct was characterized by bad faith, the Court will still impose sanctions.  However, it is likely that a lesser sanction than those injunctive sanctions proposed in the Court's prior opinion and order will be just as effective a deterrent.  Any sanction appearing on these Respondents' records is going to lead to further inquiry by other courts into the misconduct that necessitated that sanction, thereby putting those courts on notice of the potential for similar misconduct in their own cases.  As this was the intended effect of the notices proposed as injunctive sanctions by this Court, those notices will not be necessary, and a lesser sanction will satisfy the purpose of Rule 11 and vindicate judicial authority.

III.     **Conclusion**

THE COURT FINDS that Respondent Stephen C. Engstrom bears no responsibility for the violation of Rule 11 and did not abuse the judicial process, and NO SANCTIONS SHALL ISSUE against him.

THE COURT FINDS that Respondents Ackerman, Goldman, Pruitt, Vowell, Putman, Taylor, Mustokoff, Myers, Thompson, and Castleberry violated Rule 11 and abused the judicial process, but did not do so in bad faith.  IT IS THEREFORE ORDERED that NO SANCTIONS SHALL ISSUE against these Respondents.

THE COURT FINDS that Respondents Keil, Goodson, Roselius, Weber, and Norman violated Rule 11 and abused the judicial process, and did so in bad faith.  IT IS THEREFORE ORDERED that these Respondents are REPRIMANDED.

IT IS SO ORDERED this 3rd day of August, 2016.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE